# 22-1135

---

## United States Court of Appeals
## for the
## Second Circuit

---

JOHN J. HEIM,

*Plaintiff-Appellant,*

-against-

BETTY DANIELS, ADRIAN MASTERS, HAVIDAN RODRIGUEZ,
UNIVERSITY AT ALBANY and THE STATE UNIVERSITY OF NEW YORK

*Defendants-Appellees.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF NEW YORK

---

## APPELLANT'S BRIEF

---

### Cooper Erving & Savage LLP
*Attorneys for Plaintiff-Appellant*
39 North Pearl Street
Albany, New York 12207
(518) 449-3900

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................. i

TABLE OF AUTHORITIES ........................................................ iii

JURISDICTIONAL STATEMENT ............................................... 1

QUESTIONS PRESENTED .......................................................... 1

STATEMENT OF THE CASE ...................................................... 2

STATEMENT OF FACTS ............................................................. 6

ARGUMENT ................................................................................. 26

I.     **THE DISPUTE BETWEEN KEYNESIAN AND EQUILIBRIUM ECONOMISTS, IN WHICH JOHN HEIM PARTICIPATED, IS NOT AN ARCANE ACADEMIC DISPUTE, AS THE DISTRICT COURT REGARDED IT, BUT A MATTER OF PUBLIC CONCERN.** ................................................................. 26

II.    **PROFESSOR HEIM'S SPEECH ON KEYNESIAN ECONOMICS FITS WITHING THE ACADEMIC RESERVATION SET FORTH BY THE SUPREME COURT IN THE SEMINAL CASE OF *GARCETTI V. CEBALLOS*, AND HIS SPEECH WAS NOT COMPELLED BY HIS JOB DUTIES.** .......... 31

      A.    The District Court misapplied precedent. .................... 32

      B.    The District Court overlooked the academic reservation in Garcetti v. Ceballos. ................................................ 33

      C.    Professor Heim's speech was not compelled by his job duties. ........ 41

III.   **DEFENDANTS RETALIATED AGAINST PLAINTIFF FOR HIS ADVOCACY OF KEYNESIAN ECONOMICS WHEN THEY CANDIDLY ADMITTED IN WRITING THAT THEY WOULD NOT CONSIDER HIM FOR PROMOTION BECAUSE HE WAS A KEYNESIAN ECONOMIST** ............................................... 44

i

IV.  **WHILE THE PARTIES AGREE THAT DEFENDANTS ARE ENTITLED TO MAKE JUDGMENTS AS TO THE QUALITY OF AN APPLICANT'S SCHOLARSHIP, THE DEFENDANTS EXCEEDED THE SCOPE OF LEGITIMATE INQUIRY BY PENALIZING PLAINTIFF FOR HIS VIEWPOINT AND DISREGARDING HIS SCHOLARLY ACCOMPLISHMENTS** ............ 49

CONCLUSION .................................................................. 51

CERTIFICATE OF COMPLIANCE WITH F.R.A.P. RULE 32 (a)(7)(B) ............ 53

# TABLE OF AUTHORITIES

## CASES

Abcarian v. McDonald, 617 F.3d 931 (7th Cir. 2010), cert. denied,
131 S.Ct. 1685 (2011) .................................................................. 37, 38, 39

Adams v. Trustees of the Univ. of N.C. -- Wilmington, 640 F.3d 550
(4th Cir. 2011) .................................................................................... 36

Bhattacharya v. SUNY Rockland Cmty. Coll., 719 F. App'x 26, 27
(2d Cir. 2017) ..................................................................................... 35

Bickerstaff v. Vassar Coll., 196 F.3d 435, 455 n.7 (2d Cir. 1999) ............... 26

Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ., 444 F.3d 158
(2d Cir. 2006) ..................................................................................... 27

Citizens United v. FEC, 558 U.S. 310, 339 (2010) .................................. 14

Colvin v. Keen, 900 F.3d 63 (2nd Cir. 2018) ......................................... 29

Connick v. Myers, 461 U.S. 138, 149 (1983) ...................................... 30, 40

Demers v. Austin, 746 F.3d 402, 412 (9th Cir. 2014) ............................. 38

Ezuma v. City University of New York, 665 F.Supp.2d 116 (E.D.N.Y.
2009), aff'd, 367 Fed. Appx. 178 (2nd Cir. 2010) ........................... 34, 38, 39

Garcetti v. Ceballos 547 U.S. 418 (2006) .................................... 2, 25, 31-43

Giacoletto v. Amax Zinc. Co., 954 F.ed 424, 426-427 (7th Cir. 1992) ......... 46

Gorum v. Sessoms, 561 F.3d 179 (3rd Cir. 2009) .............................. 35, 39

Jeffries v. Haleston, 52 F.3d 9 (2nd Cir. 1985) ...................................... 50

Kennedy v. Bremerton Sch. Dist., 142 S. Ct. 2407 (2022) ....................... 41

Keyishian v. Bd. of Regents of the Univ. of the State of N.Y., 385 U.S. 589, 603, 87 S.Ct. 675 (1967) ........................................................................ 40

Lane v. Franks, 573 U.S. 228, 237 (2014) ............................................. 35

McGuire v. Warren, 207 Fed. Appx 34, 36-37 (2nd Cir. 2006) ............... 42

Meriweather v. Hartop, 992 F,3d 492, 505 (6th Cir. 2012) ..................... 38

Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977) ........ 50

Perry v. Sindermann, 408 U.S. 593, 598, 92 S.Ct. 2694, 2698 (1972) .......... 40

Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cty., Illinois, 391 U.S. 563, 88 S. Ct. 1731 (1968) ............................................................. 40

Piggee v. Carl Sandburg College, 464 F.3d 667 (7th Cir. 2006) ......... 37, 39

Porr v. Daman, 239 Fed. Appx. 84, 85 (2nd. Cir. 2008) ......................... 30

Renken v. Gregory, 541 F.3d 769 (7th Cir. 2008) ......................... 37, 38, 39

Riccuiti v. Gyzens, 834 F.3d 162, 169 (2nd Cir. 2016) ..................... 42, 49

Singer v. Ferro, 711 F.3d 334, 342 (2nd Cir. 2012) ............................... 29

Sousa v. Roque, 578 F.3d 164 (2nd Cir. 2009) ....................................... 29

Specht v. City of New York, 15 F.4th 594 (2nd Cir. 2021) ............ 29, 31, 42

Stern v. Trustees of Columbia University, 131 F.3d 305, 313 (2nd Cir. 1997) ....... 46

Weintraub v. Bd. of Educ. of City Sch. Dist. of City of N.Y., 593 F.3d 196, 201 (2d Cir. 2010) ........................................................................ 25, 32

**STATUTES**

28 U.S.C. § 1291 ................................................................................... 1

**OTHER**

iv

Journal of Economic Literature........................................................16, 47

New York Times..............................................................................10, 39

## JURISDICTIONAL STATEMENT

Plaintiff-appellant John Heim brought this action in the United States District Court for the Northern District of New York against defendants alleging that he is entitled to damages for violation of his constitutional right to free speech as provided in 42 U.S.C. § 1983. [A-58-69] Some of the initial claims (age discrimination and injunctive relief) that are not germane to this appeal were dismissed at the outset of the litigation. [A-14-15]

The District Court had jurisdiction of the federal claims under 28 U.S.C. § 1331 because the causes of action arose under the laws of the United States and civil rights jurisdiction under 28 U.S.C. § 1343. [A-58]

This is an appeal from a final judgment granting defendants' motion for summary judgment dismissing Plaintiff's cause of action for violation of plaintiff's constitutional right to freedom of speech. [A-12-55] Plaintiff filed a timely notice of appeal with the Clerk of the District Court. [A-84] This Court, therefore, has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

## QUESTIONS PRESENTED

1. Is this dispute between Keynesian economists and Equilibrium economists an arcane academic dispute, as the District Court held, or a matter of public concern that pervades all government economic policy-making, and were Professor Heim's writings relevant to government policy-makers?

1

2.    Did Professor Heim's speech on Keynesian economics fit within the academic reservation set forth by the United States Supreme Court in the seminal case of *Garcetti v. Ceballos*, or was his speech compelled by his job duties?

3.    Was plaintiff retaliated against because of his speech when defendants candidly admitted in writing not hiring him because he is a Keynesian economist?

4.    While the parties agree that defendants are entitled to make judgments as to the quality of an applicant's scholarship, did the defendants exceed the scope of legitimate inquiry by penalizing plaintiff for his viewpoint and disregarding his scholarly accomplishments?

## STATEMENT OF THE CASE

The District Court misunderstood the nature of this case.  The District Court spent most of its opinion analyzing whether the University at Albany completely muzzled Professor Heim's speech (though, as we will see, it was muzzled to an important extent).   But that is not what this case is about.  This is a First Amendment retaliation case. Plaintiff contends that he was denied advancement to a full-time professorship because of views he expressed both on-campus and off-campus. [A-57, 65]

If the political science department of a public university came under the control of Marxists, who denied advancement to conservatives because they did not publish in Marxist journals, the courts would instantly recognize that as a First

Amendment violation, *i.e.* discriminating against a professor because of his or her viewpoint. The conservative professor could espouse his views all he wanted but no graduate students would receive the benefit of his tutelage because his teaching would remain limited to lower-level courses and, most importantly, he would be denied promotion to any higher position in the academic ladder because of his viewpoint. This case is of the exact same kind.

John Heim was an adjunct professor at the University at Albany (formerly the State University of New York at Albany or SUNY Albany) who sought advancement to a tenure track position. Advancement was denied because he is a Keynesian economist. This is very explicit in the record. No inferences are required to draw this conclusion. Defendants said so, in writing, and in their testimony, repeatedly as detailed in the Statement of Facts.

Keynesian economics is not some outlier theory of economics (unlike Marxian economics) but was the prevailing viewpoint in the economics profession until the period of stagflation in the 1970s. Then many economists began to reject the traditional Keynesian methodology and prescriptions which were based on the concept that markets were either out of equilibrium or reached equilibrium but at a level that would not adequately provide for the needs of the population. In their macroeconomics, Keynesians used concepts that were based on analysis of the

ability of the economy as a whole to provide for the public (macroeconomics), which was not necessarily connected to the functioning of markets. [See footnote 2, *infra*.]

A large part of the economics profession held that Keynesians could not explain the stagflation of the 1970s and moved in the direction of so-called Dynamic Stochastic General Equilibrium theory (DSGE), which held that, using sophisticated mathematical techniques, economists could now extrapolate workable models for the macro economy from markets in the micro economy, thus supporting models which advanced toward ideal equilibrium. This is called "micro foundations of macro." They rejected the Keynesian approach as "ad hoc," because there was no linkage in Keynesian economics between the micro economy of markets and the macro or whole economy. Sophisticated mathematics, they contended, overcame the Keynesian objection to neo-classical economics, in which equilibrium of supply and demand in markets was assumed. Over time, the DSGE approach became gospel in many economics departments. [Id.]

Then the financial crisis of 2008 occurred, which demonstrated to many that Keynes' critique, asserting that the equilibrium-oriented approach did not reflect the real world, remained a better descriptor of how economies actually functioned than DSGE. Some proponents then recognized the inadequacy of DSGE and considered it a mistake. [Id.]

A public debate followed between advocates of Keynesianism and DSGE. John Heim's scholarship took place against the background of that debate. He published four books which included discussion of important issues of fiscal policy, proposing Keynesian equations to model the United States economy, and explaining why DSGE models did not work as well as Keynesian analysis. [A-529] His books were favorably reviewed not only in the top journal of the American Economics Association but also by the leading economics professor at the University of Albany economics department itself. [A-529-530, 548] No one in the University of Albany economics department had published any works of the scale which Professor Heim undertook in his books. [A-530] Rather, the leaders of the department insisted that, to gain their favor, aspiring professors could not publish books but only should publish micro foundations of macro articles in DSGE-dominated journals. [A-52]

Whether liberal or conservative, whether an advocate of government intervention or for non-interference in markets, the top economists in the history of the world have typically published their work in books. Thus, under the standards of the leaders of the University at Albany economics department, they would not be pleased to promote either John Maynard Keynes himself or the legendary free market theoretician Milton Friedman. [A-547] They say economics has irreversibly changed. That is, however, a value judgment, not a judgment as to the quality of scholarship.

5

When the District Court finally addressed the free speech retaliation claim, it held the claim unavailing because of the university's right to judge the quality of professorial scholarship. [A-50-53]  However, that is simply contrary to the record of this case.  This dispute is not about scholarship, and defendants' position is not grounded in scholarship.  It is about viewpoint.

## STATEMENT OF FACTS

The District Court paid little attention to many relevant facts advanced by plaintiff for two reasons.  First, the District Court saw the dispute between Keynesians and Equilibrium advocates as an "arcane" academic dispute between "policy wonks" in which it did not wish to become involved. [A-29, 45][1] The factual nature of this dispute, however, is important in determining whether it is a matter of public concern or an arcane matter of interest only to academics and policy wonks. Second, the District Court had a very narrow view of protected speech in the context of public employment.  As a result, it focused only on plaintiff's classroom activities, though it failed to appreciate the extent to which plaintiff's classroom speech was constrained.  The District Court's single-minded focus on the classroom excluded the role plaintiff's publications played in defendants' denying him advancement in the economics department.

---

[1]The District Court's deprecatory comment about "policy wonks" seems odd to say the least. Legislators and Presidents often rely on such people to develop laws that we live by.

6

Keynesian economics is a perfectly legitimate academic endeavor.[2]

In the world of academic economics, there is a split of opinion between theorists of DSGE (Dynamic Stochastic General Equilibrium) and Keynesian economists. So-called freshwater economists (at universities located in the interior of the United States, such as the University of Chicago) use DSGE methods, whereas saltwater economists (at universities located on the coasts of the United States, such as Ivy League institutions and the Massachusetts Institute of Technology – MIT) are known for their adherence to Keynesianism. [A-530-533]

Keynesianism is an approach to macroeconomics that arose out of the Great Depression. Prior to that cataclysmic event, neoclassical economists believed supply and demand tended to come into balance (called market clearing) and that the solution to the Great Depression was to wait for long run equilibrium to return. The famous British economist John Maynard Keynes rejected that approach, responding with his oft-quoted adage "in the long run we are all dead." He posited that economies could reach a lower equilibrium state that included mass involuntary unemployment, that a higher equilibrium state might not return for years or even decades, and that the government should intervene with spending, tax cuts, and

---

[2] [See Heim Aff. ¶¶ 18-37, A-530-537, for a detailed explanation of economic theories]

expansion of the money supply to restore the economy to its prior levels. Otherwise, desperate people would turn to war, fascism, or communism. [A-530-531]

For Keynes, the Great Depression was caused by insufficient aggregate demand, that is consumers having insufficient purchasing power to drive the economy forward. When consumers spend money in the economy, businesses respond by producing goods and services, but when aggregate demand is lacking, the economy is depressed. [A530-532]

A macroeconomist, according to the Federal Reserve, is someone who studies the operation of the entire economy as a whole (in comparison to microeconomists who study the behavior of firms or sectors of the economy or particular markets). [A-530 (quoting Federal Reserve definition of macroeconomics)] Professor Heim uses econometric (statistical) analysis to test economic models and to come up with equations that more accurately describe how the economy works. [A-527 fn. 3 (defining econometrics); 528]

The DSGE alternative uses sophisticated mathematical equations to derive the macro economy from the micro economy, based on the belief that the macro economy is nothing more than the sum of its micro parts. That is called "micro foundations of macro." Keynesians reject this approach because they believe it does not account at all for the problem of aggregate demand and market failures. [A-531-532] Leading DSGE economists have admitted that their approach, with its emphasis

8

on the economy always being in equilibrium, does not explain depressed economic conditions. [A-533-534] Further, they argue that since the economy tends to equilibrium, there is always a job for anyone who wants one, albeit at low wages, so there was no involuntary unemployment, even in the Great Depression. [A-8]  For this reason, DSGE economists are said to be a modern version of neoclassical economists, the economists who emphasized market clearing before the advent of Keynes.  [A-533, 578-586]

Following the Great Depression, Keynesian ideas ruled in academia, government, and business.  However, in the 1970s, there was criticism of Keynesianism as being unable to explain stagflation.  Stagflation refers to an economy that is experiencing a simultaneous increase in inflation and stagnation of economic output. Stagflation was first recognized during the 1970s when many developed economies experienced rapid inflation and high unemployment as a result of the oil shock brought on by OPEC (the Organization of Petroleum Exporting Countries) raising prices and restricting supply. [A-532]

An economist at the University of Chicago named Robert Lucas developed a critique of Keynes, arguing that consumers would shift their behavior in response to changes in government policy, thus ushering in a new period in which historic Keynesian variables could not be used to explain the economy.  For example, if there was a tax cut, consumers would expect a tax increase in the future, and would not

9

spend to stimulate the economy. This theory, in which consumers were perfect predictors of the future, led to a revival of microeconomics as the foundation for macro. DSGE mathematical techniques were used to extrapolate the micro economy from the macro. [A-499-500, 539 fn. 9]

Keynesians objected to the perfectly rational consumer posited in the so-called "Lucas critique." Consumers, particularly at low levels of the income spectrum, are spenders. When they have additional money, they tend to spend it, not wait for future developments. Such is the foundation for policies like the Obama cut of the payroll tax following the financial crisis of 2008 and increases in the minimum wage, all of which tend to increase aggregate demand. [Id.]

Just as DSGE ideas were getting a grip on academia, the financial crisis of 2008 took place. Keynesians reacted with intense criticism of DSGE, saying it was purely theoretical, and not of the real world because DSGE models did not account for the possibility of financial crises, nor were they supported by econometric studies of the economy. [Id.] Paul Krugman, a Nobel Prize winning economist, a Professor at Princeton, and a columnist on economics for the *New York Times*, summarized the debate as follows:

> Olivier Blanchard [economist at MIT] has a characteristically informed, lucid essay on the role of DSGE models in macroeconomics, in which he accurately describes the problems with these models but – again characteristically – tries to make peace with both sides, calling for reform of this dominant paradigm [DSGE] rather than tossing the

10

whole thing. I understand his motivations. But what strikes me is just how sad a portrait he offers of the state of macroeconomic theory.

Here's how I would approach the issue: by asking how we know that a modeling approach is truly useful. The answer, I'd suggest, is that we look for surprising successful predictions. General relativity got its big boost when light did, in fact, bend as predicted. The theory of a natural rate of unemployment got a big boost when the Phillips curve turned into clockwise spirals, as predicted, during the stagflation of the 1970s.

So has there been anything like that in recent years? Yes: ***economists who knew and still took seriously good old-fashioned Hicksian IS-LM type analysis***[3] ***made some strong predictions after the financial crisis that were very much at odds with what lay commentators, and quite a few economists, were saying. They – OK, we – declared that with interest rates near zero[,] massive increases in the monetary base would not cause high inflation, that large budget deficits would not drive interest rates up or crowd out private investment, and that fiscal multipliers would be positive, in fact more than one, and would be considerably larger than estimates based on non-liquidity-trap episodes suggested.***[4]

And all of that came to pass. Those of us who knew our Hicks, directly or indirectly, seem to have had a real advantage over those who didn't.

Can you say anything comparable about DSGE? Were there any interesting predictions from DSGE models that were validated by events? If there were, I'm not aware of it.

Yet even while failing to offer any measurable gains in insight, ***DSGE had the effect of crowding out the stuff that actually did work.*** Olivier writes:

I have found, for example, that I could often, as a discussant, summarize the findings of a DSGE paper in a simple graph. I had learned

---

[3] John Hicks was a British economist who translated the principles contained in the books of John Maynard Keynes into mathematical equations.

[4] As explained below one of Professor Heim's books is about the "crowding out effect" in which public investment is said to "crowd out" or reduce private investment.

something from the formal model, but I was able (and allowed as the discussant) to present the basic insight more simply than the author of the paper. ***The DSGE and the ad hoc [Keynesian] models were complements, not substitutes.***

Um, no – he notes that he was allowed to present the basic insight more simply only because he was the discussant, ***but that the author of the paper wasn't allowed to do the same thing. That's DSGE substituting for, in fact, preventing the ad hoc approach. And most macro papers aren't published along with insightful discussions by Olivier Blanchard! There is a real loss and cost here.***

So what is the gain from this style of modeling? Olivier offers some awfully weak tea: DSGE models can fulfill an important need in macroeconomics, that of offering a core structure around which to build and organize discussions. Really? That's the point of a paradigm that has taken over the field? ***It sounds, by the way, exactly like the defenses I heard of academic Marxism when I was young: never mind whether it's right, it provides a framework.***

Now, I don't know how to reform all of this. There is a huge amount of sunk intellectual capital in this modeling approach. But at the very least we should admit to ourselves how very sad the whole story has become. [Emphasis added] [A-533-535]

Plaintiff does the Hicksian IS-LM work that Krugman was referring to. This is demand-driven Keynesianism, as Keynes himself would have recognized it. [A-535] Further, this case shows that DSGE is "crowding out the stuff that actually works," because certain academics, like defendants here, won't have anything other than the Lucas critique or DSGE, no matter what.

Other preeminent economists have been similarly critical of the DSGE approach. Joseph Stiglitz, former chief economist at the World Bank, and now a Professor at Columbia, wrote: "In advanced economies, Keynesian economics is the

bread and butter of economic forecasting and policy making. Expansions are longer and downturns shallower and shorter, because Keynesian prescriptions work. . . . [W]e do have a wealth of experience from which to draw inferences. This wealth of experience all points in one direction: Keynes's teachings are still very much alive. . . ." [A-545]  Gregory Mankiw, the leading macroeconomist at Harvard University, said: "DSGE failed as a way of replacing Keynesian theorizing . . . New classical and ["] new Keynesian["] research [a term of art referring to an effort to reconcile Keynes with DSGE principles] has had little impact on practical macroeconomists . . . The work of the past several decades looks like an unfortunate wrong turn." [A-545]  In 2021, the former chief economist of the New York Stock Exchange wrote: "I read the brilliant work of John Maynard Keynes. I became the chief economist of the New York Stock Exchange and later professor of economics at Pace University. Not only has Keynesianism prevailed in the world of academic ideas but also in the world of economic policy." [A-540]  A columnist for Blumberg News with strong academic credentials wrote:  "As far as I am aware, private-sector firms don't hire anyone to make DSGE models, implement DSGE models, or even scan the DSGE literature. There are a lot of firms that make macro bets in the finance industry – investment banks, macro hedge funds, bond funds. To my knowledge, none of these firms spends one thin dime on DSGE.  I've called and emailed everyone I could think of who knows what financial-industry macroeconomists do, and they're all

unanimous – they've never heard of anyone in finance using a DSGE model." [A-546]

The past president of the Economic History Association testified that Keynesian analysis is borne out by economic history. [A-538] The Chief Economist of the New York State Assembly, who also teaches at SUNY Albany, testified that Keynesian modeling was preferable for economic forecasting, which is necessary in the preparation of State budgets. [A-539] The Associate Professor of Economics at the Albany College of Pharmacy testified that Keynesianism has stood the test of time in contrast to theoretical DSGE models which are not founded in the real world. [A-539-540] In sum, DSGE models, whatever their theoretical benefit, have little utility in modeling real world economies.

The point here is not who is right. The point is that there are contending schools of thought in academia and that the Keynesianism plaintiff practices remains a respected point of view worldwide. Young economists need access to both points of view to prepare for the economic future. And that occurs not in introductory courses but in graduate courses. Professor Heim, because of his Keynesianism, was denied the opportunity to teach graduate courses, whereas Yue Li and Ben Griffy, who were hired, teach graduate courses. [A-466, 551]. *See Citizens United v. FEC*, 558 U.S. 310, 339 (2010) (the First Amendment protects not just the right to speak but the right of citizens to hear). "When Government seeks to use its full power . . .

to command where a person may get his or her information or what distrusted source he or she may not hear, it uses censorship to control thought. This is unlawful. The First Amendment confirms the freedom to think for ourselves." *Id*. at 356.[5]

<u>Defendants repeatedly expressed unjustified and unsubstantiated hostility to Keynesianism.</u>

Plaintiff John Heim is a Keynesian macroeconomist. [A-530] He was originally a Clinical Professor at Rensselaer Polytechnic Institute, whose role was exclusively teaching. While he started his research in macroeconomics at RPI, he left RPI to go to SUNY Albany as an adjunct professor so he could continue to teach a few courses but would have more time to concentrate on his research. In his capacity as an adjunct, Professor Heim taught introductory economics classes to undergraduate, including economic statistics. [A-528-529] Doing research was not part of his job duties. [A-255, 163 (Heim: undergraduate courses involve all points of view but the department selects only DSGE advocates for graduate courses and for research); A-843, 872-754 (Daniel: Keynesian analysis useless for research; adjuncts hired to teach not do research); A-637 (Masters: Keynesians do not make contributions to economics anymore).]

In their quest for summary judgment, defendants repeatedly attacked the type of Keynesian economics plaintiff does as anachronistic, outdated, and passe. [A-27]

---

[5] Despite *Citizens United*, the District Court nonetheless accepted the prerogative of defendants to restrict graduate teaching to the DSGE methodology. [A-52]

15

This is contrary to the record and simply confirms plaintiff's assertion that he was not allowed to teach advanced economics classes nor hired for a full-time position because of his Keynesian viewpoint. The Heim affidavit contains the following evidence that plaintiff was penalized for his Keynesian viewpoint:

¶¶ 10, 11 – Plaintiff was recruited to teach at SUNY Albany by econometricians who appreciated the need to test all models for accuracy in the real world. [A-527-528; see fn. 3 explaining econometrics as statistical methods for testing the adequacy of economic predictions]. He then taught large-scale macroeconomic modeling; but he removed from teaching that class by defendant Daniel.[6] [A-528-529]

¶¶ 12, 13 – Plaintiff has published four books, two in 2017, and two in 2021. Defendants denigrate those books as based on outmoded research though they were listed as significant in the *Journal of Economic Literature*, a publication of the American Economics Association, which is recognized as the second highest-ranking journal in the economics profession. [A-547-548] Further, these books contain quantitative research as to which equations should be used in modeling the economy on a large-scale. They are not textbooks, which is the pejorative phrase defendants used in reference to them. While defendants turned their noses up at

---

[6] The District Court pooh-poohed this fact. The point, however, is not to use it to create a separate claim but as further evidence that defendants were hostile to plaintiff's viewpoint. As the District Court noted in a footnote, material outside the statute of limitations may be used as evidence even if does not support a claim for relief. [A-48, fn. 12] *E.g. The Port Authority Police Asian Jade Society v. The Port Authority of New York and New Jersey*, 681 F.Supp.2d 456, 462 (S.D.N.Y. 2010).

Heim's work, it was favorably reviewed by the highest-ranking professor in the SUNY Albany economics department, Kajal Lahiri, whom one economist described as a superstar of econometrics [A-539], as follows:

> Yes, this book provides a much needed alternative to the approaches used today for modelling economies. As such, this book could be a standard for many studying or conducting research in macroeconomics. . . . Yes, there is a thorough literature review and engages with recent scholarship. It is clear that the author has done his background research. This approach is different from the mainstream method and, as a result, presents an important alternative. ***The scholarship presented is very good.*** . . . Yes, the author is well-qualified to produce a high quality book on this topic. ***He has considerable experience in macroeconomic modelling and his approach used in this book proposal has been vetted in numerous presentations at conferences and among colleagues***. . . . The only controversy of the proposal is that the modelling approach used by the author is one that some/many would consider outdated since the field has moved to using DSGE or VAR models. However, ***the author explains very well why those approaches are not better than the approach he uses. In fact, this is a strength of the paper; he outlines in great detail why a Keynesian Cowles modelling approach is more accurate in describing how the macroeconomy really works.*** [Emphasis added]

[A-529-530]

¶ 32 – In reviewing candidates, Masters and Daniel commented positively on DSGE and negatively on Keynesianism. Numerous comments of this kind are contained in spreadsheets in which the hiring committee evaluated and ranked candidates. [A-536-537]

¶¶ 33, 34 – At their depositions, Masters and Daniel expressed opposition to Keynesian analysis even though it may more closely reflect the real world, as

opposed to DSGE theoretical constructs.  Both admitted that DSGE often did not reflect the real world. [A-537]

¶ 35 – Masters and Daniel said they were not aware of any major economists who practice Keynesian analysis despite the commentary of Krugman, *supra*, and other examples cited above, explaining that in his view Keynesianism was preferable to DSGE.  Numerous major economists practice Keynesianism though none would be permitted to do so to any significant extent at the University at Albany. [A537-538] See also Heim Aff. Exhibit E [A-578-586 (collecting various quotations from economists about Keynesianism vs. DSGE)]

¶ 35, 36 – Daniel testified that if she did not accept the Lucas critique, one of the foundations of DSGE, she would lose her job and that a person who did not accept the Lucas critique could not a get a full-time position at SUNY Albany.  Keynesians do not accept the Lucas critique.  Thus, even a Nobel prize winner like Paul Krugman, could not be hired at SUNY Albany. [A-538]

¶ 43 – In 2013, Daniel wrote the following to Heim in an expression of bias that tells the tale: "You are correct that we are heavily invested in micro foundations of macro as this is the research trend in the top macro and general field journals.  Since we expect our faculty to publish in these journals, we do intend to continue with this direction, I did consult with Adrian and John and we agree with you that your research differs from the course of research we want to pursue.  I expect that we will

hire a junior person recently trained in these techniques." In that email, she told him not to bother applying for an opening for a full-time position in the economics department. [A-540-541; 588-589]

¶ 51 – In 2017, Masters wrote a long email to Heim saying that the reasons why Heim's application for a full-time Assistant Professor position was rejected had nothing to do with the technicalities of his application, such as letters of recommendation, but because the economics department did not agree with the type of research he did, *i.e.* Keynesian research. He repeated what Daniel had written in 2013. He argued, for example, that Heim could not teach "modern" DSGE economics, when in fact Heim taught those techniques for years at RPI, using the very same textbook Masters found acceptable.[7] [A-543-544]

¶ 51-53 – Masters wrote to Heim that he lacked "synergies" with others in the economics department even though other leading economists, like Olivier Blanchard of MIT, as discussed in the Krugman quotation, and Joseph Stiglitz, disagree with Masters that Keynesians cannot integrate into a DSGE department. [A-543-544]

---

[7] Defendants' claim that plaintiff did not submit the required letters of recommendation is false because his application was not rejected for that reason; he did submit the minimum number of letters (two); he confirmed in writing that Kajal Lahiri, SUNY's top economist, was writing a letter for him; Masters could have easily asked Lahiri, who was in the same Department, to get his letter in; Masters admitted letters of recommendation often came in late; and many candidates were interviewed even though their letters had not yet been received. [A-542] Yue Li testified that neither she nor anyone else on the hiring committee cited lack of recommendations as a reason for not hiring Heim. [A-549-550]

¶ 53 – Masters wrote in an email speaking for himself and Daniel and admitting explicitly that candidates were rejected if they did "New Keynesian macro which we do not appreciate." [A-544-545] New Keynesians employ DSGE principles in their models. [A-533, fn. 6] To defendants, any association with Keynesianism spelled doom for any candidate for a full-time professor position.

¶ 65, 66 – Lewis Segal was brought in as a lecturer, a position Masters admitted Heim was qualified to fill, without a competitive hiring process, contrary to SUNY Albany policy, thus excluding Heim from consideration. SUNY Albany has not a single Keynesian macroeconomist on its faculty in any full-time position. [A-512-513, 552]

Plaintiff's academic qualifications are beyond reproach.

Since there is direct evidence of defendants' bias against plaintiff because he is a Keynesian, the burden shifts to defendants to show that they would not have hired Heim anyway. They argue that his scholarship was not of sufficient quality.[8] This is manifestly contrary to the record as collected in the Heim Affidavit:

¶ 9 – Defendants deny that plaintiff had experience teaching graduate and Ph.D. students which is false. He had that experience at RPI where he supervised Ph.D. and graduate theses. [A-528]

---

[8] To the extent defendants argue plaintiff was too old for the position, age is not a legitimate criterion under Federal or State Law. 29 USC §§ 623, 631. New York Executive Law § 296(1)(a).

¶ 13 – In a quotation cited *supra*, Plaintiff's scholarship was praised by the highest-ranking professor in the SUNY Albany economics department who noted that it challenged defendants' orthodoxy. [A-529-530]

¶ 14 – The University at Albany publicized Heim's *Crowding Out Fiscal Stimulus* book, honored its publication at an "Authors and Artists Reception," and listed it in a "Celebration of Scholarship" event. Heim's book publications were an unusual event for SUNY Albany because no member of the macroeconomics faculty has published any books since the department's creation in the 1960s. [A-530]

¶ 28 – Those who SUNY Albany calls macroeconomists do not fit the definition of macroeconomists used by the Federal Reserve. [A-530] Rather than studying the whole economy, as Heim does, they study only small segments of it or particular markets, such as the labor market or the market for health care. [A-535]

¶ 59 – Defendants only accept DSGE journal publications as valid indicators of scholarship when many of the greatest economists in the world publish their work in book form; the peer review process for books is superior to that of journal articles (the former use professors to evaluate books for publication, while the latter often use graduate students); and large-scale macroeconomic modeling is better suited for book publication because of its sheer size, in comparison to small journal articles. Further, defendants' definition of "top journals" only consists of self-selected journals they subjectively recognize as prestigious, contrary to the only objective list

21

of "top journals" which is recognized by the American Economics Association. The number two ranked *Journal of Economic Literature*, published by the American Economics Association, listed Heim's books as significant publications. No SUNY Albany macroeconomics professor has been similarly feted. [A-546-549]

¶ 59 – The house that published Heim's books, Macmillan, is one of the highest quality academic publishers, according to testimony by both SUNY's Dean of Arts & Sciences and its highest-ranking economist. [A-546] Masters agreed that the subject of Heim's book *Crowding Out Fiscal Stimulus* was an important topic in macroeconomics and that Heim used the scientific method in his analysis [A-546-547, 710]. Nonetheless, Masters testified his department does not care about books, despite the fact that leading economists such as Keynes, Milton Friedman (a Chicago free market economist), Joseph Stiglitz, Robert Solow (a Nobel prizewinner who reviewed Heim's book), Gregory Mankiw, and others published books. The famous book *Capital in the Twenty-First Century*, by the leading French economist Thomas Piketty, which was the *Financial Times* and McKinsey Business Book of the Year in 2014, is an example of why the type of work plaintiff does is not suitable for short journal articles; Piketty's work is over 600 pages. What made the book significant was its content, and the statistical support Piketty amassed to support its findings, not whether Piketty had published some journal article earlier in his career. [A-505] In fact, defendants have no basis for criticizing Heim's scholarship because they

22

rejected his books without reading even a portion of them. They also had no familiarity with the requirements for submitting a book for publication. [A-547]

¶ 61, 62 – Plaintiff's qualifications for a macroeconomics position were far superior than the inexperienced Yue Li and Ben Griffy who were hired but whose publications were non-existent. Heim had published two highly significant books involving macroeconomic modeling and had prior experience teaching at the graduate and Ph.D. level, whereas the other two, who were beginners, had none. In fact, Li, as a member of the hiring committee, gave Griffy a low rating because of his narrow focus on an aspect of the labor market and his weak presentation skills. He was hired because he did the same work as Masters even though Daniel testified that a quality department should not just have people who do the same things. [A-506 (Masters admitting that Heim had certain qualifications that could be more highly valued); 550-551]

¶ 62, 63 – Griffy admitted that he and Masters worked in the same labor market field which did not meet the definition of macroeconomics established by the Federal Reserve. Both Griffy and Yue Li admitted that they had no understanding of Keynes and were in line with DSGE thinking. She had never read Keynes and described his theory as just wanting to print more money. This is the person SUNY Albany has teaching graduate students. [A-551] Griffy similarly lacked knowledge of Keynes. [A-519] As defendants explicitly acknowledged in emails at the time Heim's

23

candidacy for a full-time professorship was rejected, in their deposition testimony, and in their summary judgment submissions, they wanted DSGE to the complete exclusion of Keynesians. [A-551]

The decision of the District Court

The District Court began its legal analysis of these facts by denigrating the dispute between Keynesians and Equilibrium advocates as an "arcane" academic dispute fit only for "policy wonks," neglecting the impact of these approaches on the making of governmental policy. [A-29, 45] Further, the District Court ruled, so long as the Economics Department did not interfere in what Professor Heim taught in his classes, and he was allowed to teach a full course load in terms of number of classes taught (disregarding the substance of the classes he was allowed to teach), he had no claim that his First Amendment rights were violated [A-32], glossing over the fact that Professor Heim was denied advancement in the University because of his advocacy for Keynesianism in his writings and outside the classroom.

The District Court accepted defendants' logic that writing books demonstrating the superiority of Keynesian analysis was insufficient to implicate the First Amendment. The situation would have been different had Professor Heim presented "lectures or seminars on corruption in the economy or abuses in government, the State, or SUNY" or held "a rally or debate to advocate the overthrow of the economic system in our country." "Heim was merely engaged in

24

researching and teaching about 'economic modeling' and 'statistical analysis,' neither of which implicate matters of broad public concern." [A-35] Thus, to state a claim for violation of the First Amendment, political activism rather than "arcane academic work" was required.

Paradoxically, however, even though the University at Albany Economics Department did not imbue him with the ability to teach classes in which Keynesianism was paramount, or even germane to the subject matter he was assigned to teach, such as economic statistics, the Court held that the four books he wrote on Keynesian analysis were compelled by his job duties and thus not protected speech according to the doctrine set forth in *Garcetti v. Ceballos*, 547 U.S. 418 (2006). The District Court held that this Court's decision in *Weintraub v. Bd. of Educ. of City Sch. Dist. of City of N.Y.*, 593 F.3d 196, 201 (2d Cir. 2010), provided the appropriate framework for analyzing Professor Heim's claim under the rule of *Garcetti v. Ceballos*, and that under the *Weintraub* analysis, Professor Heim's claim could not be sustained. [A-27-30]

While the District Court appeared to accept that Heim was denied promotion for his Keynesian viewpoint, Professor Heim was powerless to overcome the defense of inadequate scholarship. [A36-37] The District Court said: "***Those countervailing interests necessarily include the freedom to make subjective value judgments about what kind of economic theory should be taught to public university students***.

25

[Emphasis added] See, e.g., Bickerstaff v. Vassar Coll., 196 F.3d 435, 455 n.7 (2d Cir. 1999) ("Determinations about such matters as teaching ability, research scholarship, and professional stature are subjective, and unless they can be shown to have been used as the mechanism to obscure discrimination, they must be left for evaluation by the professionals, since they often involve inquiry into aspects of arcane scholarship beyond the competence of individual judges."). [A-42]

The very quotation cited by the District Court does not give the Economic Department at SUNY Albany **_unbridled_** discretion to discriminate against professors on the basis of their preferred economic theory. The true focus must be on scholarship, not acceptance of defendants' ideological precepts. In other words, if Marxists were evaluating the scholarship of conservative professors, the Federal Courts should not be utterly incompetent to discern whether scholarship was really at issue, or viewpoint. That would allow defendants not to promote Professor Heim because he was a Keynesian, as they admitted, so long as they could conjure up some after-the-fact explanation based on allegedly deficient scholarship (not publishing in DSGE journals).

## ARGUMENT

I.  **THE DISPUTE BETWEEN KEYNESIAN AND EQUILIBRIUM ECONOMISTS, IN WHICH JOHN HEIM PARTICIPATED, IS NOT AN ARCANE ACADEMIC DISPUTE, AS THE DISTRICT**

**COURT REGARDED IT, BUT A MATTER OF PUBLIC CONCERN.**

In *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ*., 444 F.3d 158 (2d Cir. 2006), this Court discussed at length what constitutes speech on a matter of public concern in the context of a First Amendment retaliation claim. First, "[a] matter of public concern is generally 'any matter of political, social or other concern to the community.'" *Id*. at 164. There is no rule of law that speech that is uttered in academic books cannot be of concern to the community. Second, speech that is intended for a private audience may be a matter of public concern. *Id*. at 165. The fact that John Heim was not an activist or "a public intellectual" (like Paul Krugman or Joseph Stiglitz) writing books explaining economic analysis to the public at large does not mean his speech was not a matter of public concern. His speech was clearly intended to influence government policy-makers concerning economic issues of importance to the general public. That is what Keynesians do. Third, the fact that the speech does not receive mass media coverage does not make it any less a matter of public concern. *Id.* Here the speech took place against the backdrop of a nationwide, indeed a worldwide, debate about how economies actually function. Fourth, even if Heim's primary purpose in publishing Keynesian analysis were personal, that is for his own edification or amusement, which was most certainly not

27

the case, that would not make it any less a matter of public concern. The purpose is not dispositive; the question is what is the nature of the speech. *Id*. 165-167.[9]

In addition to the public debate referenced in the Statement of Facts, *supra*, an illustration of why Professor Heim's speech touched on a matter of public concern came in the testimony of Inbong Kang, Chief Economist of the New York State Assembly. Dr. Kang was also an adjunct professor in the economics department at SUNY Albany at the same time as Professor Heim. One day, he passed Professor Heim's office and noticed a flyer touting Professor Heim's work. He asked for a copy of one of his books and saw that the type of equations Professor Heim used could be helpful in analyzing the New York State economy, which Dr. Kang necessarily did for purpose of determining the New York State budget. The components of the New York State budget, including projections as to how the economy will perform under certain conditions, is critical in determining matters such as how much revenue the State will need to finance its programs and what levels of taxation are appropriate to raise the necessary revenue. These are matters of fundamental concern to the public. These are not purely matters of academic

---

[9] In *Cioffi*, the same District Court ruled that a private letter Cioffi, then Athletic Director, wrote to the Superintendent of Schools and the Board of Education concerning sexual harassment of a student in the football locker room was simply part and parcel of Cioffi's private dispute with the football coach. This Court disagreed, holding that Cioffi's speech touched on matters of public concern, namely sexual harassment and appropriate conduct of public school coaches.

interest. [A-539, 1011-1019 (full testimony of Dr. Kang in which he expressed admiration for the sophisticated nature of the analysis)]

The case law of this Circuit has not fundamentally changed since *Cioffi* on the question whether speech is a matter of public concern. Recently, in *Specht v. City of New York*, 15 F.4th 594 (2nd Cir. 2021), this Court surveyed the law concerning what is a matter of public concern. This Court held "an individual motivated by a personal grievance can simultaneously speak on a matter affecting the public at large," *id*. at 600; a protest email that the employee sent to his superiors did not qualify as a matter of public concern, *id*. at 601; but speech that was uttered to public entities outside the confines of the job qualified as being on a matter of public concern, *id*., even if the motivation for doing so may have been personal. In analyzing the difference between personal speech and public speech, the inquiry is whether the speaker was referring only to personal grievances or was addressing a broader public purpose. *Colvin v. Keen*, 900 F.3d 63 (2nd Cir. 2018). Speech is not "on a matter of public concern where it has 'no practical significance to the general public.'" *Id*. at 75. A critical question is whether the action is brought "in furtherance of 'the principle that debate on public issues be uninhibited, robust, and wide-open.'" *Singer v. Ferro*, 711 F.3d 334, 342 (2nd Cir. 2012).

The focus is on the content of what is said, not whether the communication was public or private. For example, in *Sousa v. Roque*, 578 F.3d 164 (2nd Cir. 2009),

this Court held that the plaintiff's expressions concerning workplace violence were constitutionally protected, even though he did not make any public pronouncements on the issue and the workplace violence concerns involved him personally. This Court relied on the Supreme Court's decision in *Connick v. Myers*, 461 U.S. 138, 149 (1983), that a portion of a purely private questionnaire was constitutionally protected because it addressed whether or not Assistant District Attorneys were compelled to get involved in political campaigns, an issue of concern to the public. 578 F.3d at 170. In contrast, comments made in the context of an ongoing personal dispute that would be of no interest to the public are not protected speech. *Porr v. Daman*, 239 Fed. Appx. 84, 85 (2nd. Cir. 2008).

In the present case, it should be fairly obvious that Professor Heim's speech was on a matter of public concern. It was directly related to a raging debate concerning economic policy that is of concern to the public even if the technical nature of the equations discussed might be read not by workers on the loading dock but by economists involved in making government economic policy. That government policy, involving how to spend or not spend the public's money in stimulating the economy, and to what degree such spending would be necessary to achieve improvement in the economy, is of fundamental interest to the public. For example, Professor Heim's book on *Crowding out Fiscal Stimulus* concerns the

extent to which government stimulus can adversely affect private sector investment.

[A-534 (Krugman quotation referring to "crowding out" effect)]

Indeed, there are no personal grievances to be found anywhere within Professor Heim's work; he published his books on Keynesian economics outside the academic community in which he worked; and, as we will see in the next section of this brief, he did so without any encouragement or impetus from the SUNY Albany economics department. He desired only to promote Keynesian economic policy, and the importance of Keynesianism is the focus of this litigation.

To be sure, Professor Heim seeks damages relief for himself. But that is actually required in a First Amendment retaliation case. Proof of an adverse employment action, here denial of a promotion to a full-time professorship, is an essential element of a such a claim. *Specht v. City of New York*, 15 F.4th at 599-600. This case is far more about Keynesianism than it is about John Heim.

## II. PROFESSOR HEIM'S SPEECH ON KEYNESIAN ECONOMICS FITS WITHING THE ACADEMIC RESERVATION SET FORTH BY THE SUPREME COURT IN THE SEMINAL CASE OF *GARCETTI V. CEBALLOS*, AND HIS SPEECH WAS NOT COMPELLED BY HIS JOB DUTIES.

The District Court's analysis was simple: John Heim was a Professor; his speech was contained in books; professors write books; therefore, Heim's speech was pursuant to his job duties, so his action is barred by *Garcetti v. Ceballos*, 547 U.S. 418 (2006).

The District Court's analysis was flawed in three ways. First, the Court misconstrued the import of this Court's decision in *Weintraub v. Board of Education*, 593 F.3d 196 (2nd Cir. 2010). Second, it ignored the academic reservation in *Garcetti v. Ceballos*. Third, Professor Heim's speech was not compelled by his job duties.

A. The District Court misapplied precedent.

*Weintraub* involved a non-tenured secondary school teacher's dispute with his supervisor concerning how he was evaluated in classroom management and whether he received appropriate support from the school district, which the teacher challenged using a grievance mechanism provided by his employer. According to this Court in *Specht*, "the plaintiff [in Weintraub] had 'made an internal communication pursuant to an existing dispute-resolution policy established by the employer,' which was 'not a form or channel of discourse available to non-employee citizens.'" 15 F.4th at 603. Thus, the speech at issue was pursuant to plaintiff's job duties, and his claim was barred by *Garcetti v. Ceballos*.

In contrast, as described in the Statement of Facts herein, Professor Heim used no mechanism provided by his employer. One might argue if his books had been published by the SUNY press, that might be a different situation. However, Professor Heim's books were published by the renowned private publisher Macmillan, a far more prestigious independent publishing house with worldwide

32

significance.  In no sense can it be said that Professor Heim's speech was even remotely facilitated by his employer.  The department admitted it had no interest in having professors in Heim's position publish anything at all.[10]  They were there to provide additional teaching support for the department so the tenured faculty could focus on research. [A-255, 163 (Heim: undergraduate courses involve all points of view but the department selects only DSGE advocates for graduate courses and for research); A-843, 872-754 (Daniel: Keynesian analysis useless for research; adjuncts hired to teach not do research); A-637 (Masters: Keynesians do not make contributions to economics anymore).]

B.  The District Court overlooked the academic reservation in Garcetti v. Ceballos.

This Circuit has not yet addressed the scope of the "academic reservation" articulated in *Garcetti*, 547 U.S. at 438-439.  The Supreme Court implicitly recognized the problem that certain speech arising from academics might not be popular with university leadership, as pointed out in the Statement of the Case *supra*. The Supreme Court carved out an academic reservation for speech related to scholarship and teaching by public university professors, exempting its holding from

---

[10] Heim testified that he left his position at Rensselaer Polytechnic Institute and came to SUNY Albany at the invitation of two professors who valued his work. [A-528]  At the time he was given the title of Visiting Professor.  The defendants in this case, however, vehemently denied that he deserved that title, arguing instead that he was an Adjunct Professor only.  In fact, he was in all respects paid and treated the same as an Adjunct Professor. [A-494] His title is functionally irrelevant.

33

such speech. *Id*. at 425. The *Garcetti* Court reasoned that, because academic positions necessarily entail expressing viewpoints, and because academic freedom is of "transcendent value" to the American public, it would be unwise to permit a public university to discriminate based on a university professor's academic viewpoint. *Id*.

In *Ezuma v. City University of New York*, 665 F.Supp.2d 116 (E.D.N.Y. 2009), *aff'd*, 367 Fed. Appx. 178 (2nd Cir. 2010), the Second Circuit upheld dismissal of a professor's First Amendment retaliation claim based upon the professor's expressed support for a sexual harassment claim and his challenge to the credentials of another faculty member. The lower court found that reporting sexual harassment was within the scope of plaintiff's duties as department chair. The other act of speech, challenging another academic's credentials, did not address a matter of public concern and was motivated by the plaintiff's direct personal interest in the outcome. The academic reservation was not implicated.

On the other hand, the lower court recognized that, because *Garcetti* left open the possibility of broader First Amendment protection for academic employees of public educational institutions compared to employees of other governmental agencies, a claim like Dr. Heim's should survive. *Garcetti* expressed strong reservations "that public educational institutions, with their special role in developing and communicating new and sometimes unpopular ideas, could seek to

employ Garcetti's deference to the need to avoid judicial intrusion into public personnel decisions as a means to squelch ideas that are at the heart of the First Amendment." 665 F.Supp.2d at 131. The court further noted that

> the instant case has nothing to do with academic freedom or a challenged suppression of unpopular ideas. It is, instead, an ordinary retaliation case arising out of a claim of sexual harassment. The speech at issue here could have occurred just as easily in a private office, or on a loading dock. There is nothing more elevated or important under the First Amendment about the discourse at issue here than there was in Garcetti. *Id*.

Here this case is all about penalizing a professor for an idea that is unpopular with certain economists leading the SUNY Albany economics department. It is hard to imagine Keynesian economics vs. DSGE as a matter of discussion on the loading dock.

Likewise, in *Bhattacharya v. SUNY Rockland Cmty. Coll.,* 719 F. App'x 26, 27 (2d Cir. 2017), the Second Circuit held that the plaintiff's "speech involved neither scholarship nor teaching." Id. Thus, it was proper to apply *Garcetti* to a university employee's First Amendment claim where the speech was non-scholastic. *See Lane v. Franks*, 573 U.S. 228, 237 (2014).

The Third, Fourth, Sixth, and Seventh Circuits have dealt with the *Garcetti* academic reservation question. The Third Circuit in *Gorum v. Sessoms*, 561 F.3d 179 (3rd Cir. 2009), found the professor's speech to be so unrelated to "scholarship and teaching" that the Garcetti academic reservation did not apply. This speech

included advising a student about a disciplinary code written by the plaintiff, objecting to the appointment of the defendant as president, and withdrawing a speaking invitation extended to the defendant. The court said this speech was part of the professor's official duties.

On the other hand, the Fourth Circuit in *Adams v. Trustees of the Univ. of N.C. -- Wilmington*, 640 F.3d 550 (4th Cir. 2011), refused to apply *Garcetti* to a professor's speech. It held that the professor's conservative columns, books, and speeches were not expressions made pursuant to his faculty duties just because he listed them on an application for promotion. Adams applied the academic reservation from *Garcetti*, rejecting the university's argument that the plaintiff speech was required by his duties as an employee. The court said "[p]ut simply, [the plaintiff's] speech was not tied to any more specific or direct employee duty than the general concept that professors will engage in writing, public appearances, and service within their respective fields. . . [and] that thin thread is insufficient to render [the plaintiff's] speech 'pursuant to [his] official duties' as intended by Garcetti." 640 F.3d at 564. The District Court here interpreted the law inconsistently with the reasoning of the Fourth Circuit.

Here, plaintiff's decision to promote Keynesian ideas in his four books (two published in 2017 before his application was denied) were hardly compelled by his teaching position at SUNY, which defendants admit contains no requirement that he

publish anything at all. Plaintiff acted solely to advance Keynesian principles of economics, which he (and many prominent economists) truly believed reflected the real world more than other approaches. This is in fact a case of pure speech. The mere fact that he is a member of the economics profession does not make his speech any different from a private citizen expressing his opinion on matters already in debate before the public, as the lengthy quotation from Krugman shows.

This is different from the cases which apply *Garcetti*, such as *Piggee v. Carl Sandburg College*, 464 F.3d 667 (7th Cir. 2006), a case involving the placement of a religious brochure in a student's pocket by a cosmetology professor. The court found that this act was not related to academic scholarship or professional duties.

In *Renken v. Gregory*, 541 F.3d 769 (7th Cir. 2008), the speech at issue was related to a specific grant that affected the plaintiff's duties as a professor. He had criticized and complained about the university's proposed use of grant funds. The court found plaintiff had a direct personal interest in the grant which he administered as part of his teaching and service duties. Therefore, his complaints fell within the professor's "official duties" and constituted unprotected speech. In contrast, Professor Heim sought no university funding for his work.

The Seventh Circuit reached a similar conclusion in *Abcarian v. McDonald*, 617 F.3d 931 (7th Cir. 2010), *cert. denied*, 131 S.Ct. 1685 (2011). There, the court found that plaintiff's speech about risk management, physicians' fees, and surgeon

abuse of prescription medicines fell within his responsibilities as department head of surgery at the medical university and was not protected.

In contrast, the Ninth Circuit concluded that "Garcetti does not—indeed, consistent with the First Amendment, cannot—apply to teaching and academic writing that are performed 'pursuant to the official duties' of a teacher and professor [and held] that academic employee speech not covered by Garcetti is protected under the First Amendment." *Demers v. Austin*, 746 F.3d 402, 412 (9th Cir. 2014). The Sixth Circuit concurred. *Meriweather v. Hartop*, 992 F,3d 492, 505 (6th Cir. 2012).[11] Plaintiff Heim in this case does need not seek a broad exception from *Garcetti* because, as we will see, his speech was not pursuant to his official duties but completely voluntary and beyond the scope of what he as employed to do at the University.

The following factors are present when a professor's speech is part of his official duties:

• The speech is delivered through internal channels using college resources. (*Renken*, *Ezuma* and *Abcarian*); this is not the case here. Heim's books were published outside the University.

---

[11] The District Court cited to this decision [A-37] but completely passed it by, despite not citing a single case that would undermine the academic reservation. The District Court applied *Weintraub* instead.

• The plaintiff is a departmental head or chair with broad administrative responsibilities going beyond pure academic speech. (*Abcarian*, *Ezuma*); this is not the case here.

• The plaintiff has a direct personal interest in the outcome of his speech. (*Ezuma*, *Renken*). This is not the case here. While plaintiff received some remuneration for his books, which is to be expected, that does not disqualify him from First Amendment protection. There is no evidence that monetary gain was his primary purpose in writing the books. The subject matter of his books was highly unlikely to put them on the *New York Times* bestseller list, as their scope was of interest to those engaged in academic discussion of economics (as Professor Kajal Lahiri explained) or governmental officials engaged in economic forecasting (as Dr. Inbong Kang, chief economist at the New York State Assembly, explained). [A-529-530, 539]

• The plaintiff admits his speech is part of his official job responsibilities. (*Renken*). That is not the case here.

• The speech is unrelated to scholarship or teaching. (*Gorum*, *Piggee*, *Ezuma*, and *Abcarian*). That is not the case here. It was all about scholarship and teaching.

Indeed, Dr. Heim presents exactly the type of case that was of concern in *Garcetti*. Teaching and academic writing are "a special concern of the First

Amendment." *Keyishian v. Bd. of Regents of the Univ. of the State of N.Y.*, 385 U.S. 589, 603, 87 S.Ct. 675 (1967). Accordingly, the Court should decline to follow *Garcetti* in the instant case and instead should follow the test set forth in *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cty., Illinois*, 391 U.S. 563, 88 S. Ct. 1731 (1968).

Until the Supreme Court's 2006 decision in *Garcetti*, public employees' First Amendment claims were governed by the public concern analysis and balancing test set out in *Pickering* and *Connick v. Myers*, 461 U.S. 138 (1983). First Amendment rights afforded to public employees are not lessened in the realm of academia. *Perry v. Sindermann*, 408 U.S. 593, 598, 92 S.Ct. 2694, 2698 (1972) ("twice before, this Court has specifically held that the nonrenewal of a nontenured public school teacher's one-year contract may not be predicated on his exercise of First and Fourteenth Amendment rights").

Thus, the extent to which academic speech not covered by *Garcetti* is protected under the First Amendment is analyzed under the standards set forth in *Pickering* and *Connick*. First, the employee must show that his or her speech addressed "matters of public concern." *Pickering*, 391 U.S. at 568; *Connick*, 461 U.S. at 146. Second, the employee's interest "in commenting upon matters of public concern" must outweigh "the interest of the State, as an employer, in promoting the

efficiency of the public services it performs through its employees." 391 U.S. at 568.

The application of *Pickering* will be addressed in Point IV, *infra*.

    C. Professor Heim's speech was not compelled by his job duties.

    It is not so simple to say, as the District Court did, that because professors

write books, therefore Heim's speech was part and parcel of his job duties.

    In *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407 (2022), the United States

Supreme Court discussed the meaning of its decision in *Garcetti v. Ceballos*. To

begin with, the Court reiterated the validity of the academic reservation discussed

*supra*, noting that the plaintiff's speech did not raise any issues of "academic

freedom" that may involve "'additional' First Amendment 'interests' beyond those

captured by this framework." Id. at 2424. The Supreme Court further explained:

> In other words, the prosecutor's memorandum [in *Garcetti*] was
> government speech because it was speech the government "itself ha[d]
> commissioned or created" and speech the employee was expected to
> deliver in the course of carrying out his job. . . . [In contrast, the
> plaintiff in *Kennedy*] was not engaged in speech "ordinarily within the
> scope" of his duties as a coach. He did not speak pursuant to
> government policy. He was not seeking to convey a government-
> created message. He was not instructing players, discussing strategy,
> encouraging better on-field performance, or engaged in any other
> speech the District paid him to produce as a coach. Simply put: Mr.
> Kennedy's prayers did not "ow[e their] existence" to Mr. Kennedy's
> responsibilities as a public employee. . . . . But this argument commits
> the error of positing an "excessively broad job descriptio[n]" by treating
> everything teachers and coaches say in the workplace as government
> speech subject to government control. . . . Whether one views the case
> through the lens of the Free Exercise or Free Speech Clause, at this
> point the burden shifts to the District. Under the Free Exercise Clause,
> a government entity normally must satisfy at least "strict scrutiny,"

showing that its restrictions on the plaintiff 's protected rights serve a compelling interest and are narrowly tailored to that end.

*Id*. at 2424-2426.

This Court in its prior decisions has provided considerable insight into when an employee is said to be speaking pursuant to his or her job duties and thus barred from recovery under *Garcetti v. Ceballos*.  In *Specht v. City of New York*, 15 F.4th 594 (2nd Cir. 2021), this Court noted that acquiring information in the course of public employment does not transform the speech into non-citizen speech, *id*. at 602; that speech outside the employee's official responsibilities is not non-citizen speech, id. at 603, and that speech in which a "citizen analogue exits" is not non-citizen speech, *id*.  Likewise, in *Riccuiti v. Gyzens*, 834 F.3d 162, 169 (2nd Cir. 2016), this Court, in denying application of the *Garcetti* rule, emphasized that no one in government requested the speech at issue, the speech was developed on her own time, and the speech was communicated to the public.  *See also McGuire v. Warren*, 207 Fed. Appx 34, 36-37 (2nd Cir. 2006) (permitting amendment of complaint to allow for allegations that plaintiff spoke as a citizen).

No one in government commissioned Professor Heim to write his books, nor did government play any role in creating his speech.    He did not speak pursuant to government policy.  He was not seeking to convey a government-created message.  And his speech was not part of his ordinary duties as a teacher.  His books were not part of his classes.

42

Professor Heim actually did not acquire information from the government. His writings were founded on his own independent research that he had been doing since he was a Professor at Rensselaer Polytechnic Institute, a private institution. The government defendants here had no interest in his publications. Adjunct professors were not expected to publish (and indeed those hired had no publications at all). Professor Heim did not need to be an employee of SUNY Albany to publish his books. He could have offered them for publication as a private citizen (as many books are). No one at SUNY Albany requested him to write on Keynesian economics. In fact, the economics department leaders were hostile to writings on the subject. The books were written on Professor Heim's own time. He was hired to teach, not write, and there is nothing in the record to suggest that the books interfered one iota with his duties as a teacher. Finally, his speech was communicated to the public via a private publishing house, not the government one.

Defendants' position is quite paradoxical. On the one hand, they seek the benefit of *Garcetti v. Ceballos* as if Heim's duty as an Adjunct Professor compelled him to write books on Keynesian economics. On the other hand, they were adamant that his job was not to write books, they took absolutely no interest in his work, and they actually opposed Heim's writing, clearly demonstrating that he was speaking as a citizen outside the parameters of the SUNY Albany economics department.

43

### III. DEFENDANTS RETALIATED AGAINST PLAINTIFF FOR HIS ADVOCACY OF KEYNESIAN ECONOMICS WHEN THEY CANDIDLY ADMITTED IN WRITING THAT THEY WOULD NOT CONSIDER HIM FOR PROMOTION BECAUSE HE WAS A KEYNESIAN ECONOMIST.

There should be no doubt that plaintiff was denied any possibility of advancement in the SUNY Albany economics department because of defendants' hostility to his Keynesian viewpoint. As the District Court noted, in their motion papers in support of summary judgment, defendants attacked Keynesian economics as the equivalent of flat earth theory and starting a fire by rubbing two sticks together. [A-27] Defendant Masters further testified that Plaintiff was unique in the profession, as if he were standing alone against everyone else. [A-763] Plaintiff presented ample evidence, described in the Statement of Facts herein, that such statements are inappropriate and so absurd as to call into question defendants' professed reliance on "scholarship" as a defense. Attaching unfounded labels to a leading theory of economics is hardly supportive of good scholarship.

In addition to defendants' professed hostility to Keynesians (they don't make a contribution to economic science anymore; the department is not interested in Keynesian research [A-637, 652 (Masters' testimony)], the following documentary evidence described *supra* proves that plaintiff was rejected because of his viewpoint:

- Plaintiff was removed from teaching a large-scale macroeconomics class and relegated to introductory courses of a generic nature. *See* footnote 6, *supra*.

44

- Defendants demeaned plaintiff's book publications without reviewing the books in any way nor paying any attention to the high praise given those works. Among other things, according to the top economist as SUNY Albany, the books explain why Keynesian analysis is preferable to DSGE. Defendants refused to even look at plaintiff's book *Crowding Out Fiscal Stimulu*s, while admitting it covered an important topic in macroeconomics.

- During the course of evaluating candidates for employment as a full-time professor, defendants repeatedly commented positively on DSGE and negatively on Keynesianism, even rejecting "New Keynesianism" which attempts to reconcile Keynesian principles with DSGE.

- Defendants reaffirmed in their deposition testimony, which is not cited by the District Court, their complete distaste for Keynesian analysis, accusing it of being unscientific (as if economics is a true hard science) and falsely claiming no one other than Professor Heim does it anymore.

- Defendants stated if they did not accept the Lucas critique, they could lose their jobs. There is no evidence that the university itself, outside of defendants, had any particular interest in the Lucas critique.

- Plaintiff was told in no uncertain terms not to bother applying for a full-time position and that you will not even be interviewed if you apply because we do not value your research. If defendants were not biased against plaintiff

because of his viewpoint, they would have interviewed him and discussed the books he published or planned to publish.

- Defendants brought in non-Keynesian faculty without observing the university-required competitive hiring process. This is evidence of discrimination. *Stern v. Trustees of Columbia University*, 131 F.3d 305, 313 (2nd Cir. 1997); *Giacoletto v. Amax Zinc. Co.*, 954 F.ed 424, 426-427 (7th Cir. 1992).

- Defendants hired people who were interested in the same economic issues they were interested in despite admitting that a quality economics department should have some diversity of interests.

- Defendants preferred to predict possible future qualifications of applicants who did not yet have their Ph.D. and who did not have publications in comparison to Heim's extensive teaching record and his book publications.

The following "undisputed facts" which the District Court cited in its decision to grant summary judgment are, when viewed against the evidence, nothing but pure ideological constructs which demonstrate extreme hostility to Keynesianism. The economics department's "(1) desire to 'teach and train students' to conduct DSGE macroeconomics: (2) who stood a good chance of making tenure, which required publication in a certain set of journals; and (3) who shared a DSGE research agenda that would permit constructive collaboration with other faculty members in the

department." [A-52] Point one is a violation of the principle of the *Citizens United* decision that graduate students have a right to hear Keynesian economic analysis, as the evidence shows it is one of the central approaches to economics today. It is beyond dispute that defendants would allow only DSGE advocates to teach graduate students. Point two is contradicted by the fact that Professor's Heim's books were considered significant achievements in economics both by the *Journal of Economic Literature* and by the most prominent economist at SUNY Albany, econometrician Kajal Lahiri, who one witness described as a "superstar." [A-539] Moreover, the journal list defendants used was their own self-selected subjective *ad hoc* list; the American Economics Association has its own list of top journals, and SUNY Albany professors rarely publish in those journals. Both Masters and Daniel obtained tenure without any significant record of publication in those journals. [A-547-549 (comparing their publications to the list of top journals of the American Economics Association). Further, the successful applicants (Li and Griffy) had never published in these journals. Defendants were simply appraising their ability to publish in the future. [A-507] Point three is contradicted by the evidence provided in statements by leading economists Joseph Stiglitz and Olivier Blanchard, both of whom believe collaboration between Keynesian and DSGE economists is important (even though Paul Krugman appears to regard DSGE as a bunch of bunk). It is defendants who simply refuse to collaborate.

47

As plaintiff points out, DSGE is not some great mystery that only committed devotees can master; he taught DSGE economics at RPI using one of the most prominent texts in the field. [A-543]  In sum, like the Marxists used as an example at the outset of this brief and in Krugman's critique of DSGE, defendants' position is based on pure ideology and nothing more.  The "facts" relied on by the District Court are not only contested but manifestly untrue.

The District Court begrudgingly accepted the proposition that, even though plaintiff's speech was not completely muzzled, denying him promotion because of his viewpoint would state a claim for violation of his free speech rights.  [A-47-48]  Thus, the District Court's frequent comments that plaintiff was allowed to teach two courses a semester like full-time faculty, that he was still employed as an adjunct professor when this case was brought, and that no one stopped him from doing research are really beside the point, if he were denied promotion because of his viewpoint.[12]

---

[12] In pointing out that plaintiff taught a full course load, despite being an adjunct with minimal salary several tens of thousands of dollars less than a full-time professor, plaintiff was demonstrating his commitment to teaching and work ethic.  Clearly he did not do it for the money or because teaching a full course load gave him equal status since it did not.  Teaching a full course load in his circumstances hardly is evidence that Professor Heim was not discriminated against because of his viewpoint.  Nor does one publish books that sell 500 to 1,000 copies for the money.  This case is all about Professor Heim's viewpoint.

**IV.  WHILE THE PARTIES AGREE THAT DEFENDANTS ARE ENTITLED TO MAKE JUDGMENTS AS TO THE QUALITY OF AN APPLICANT'S SCHOLARSHIP, THE DEFENDANTS EXCEEDED THE SCOPE OF LEGITIMATE INQUIRY BY PENALIZING PLAINTIFF FOR HIS VIEWPOINT AND DISREGARDING HIS SCHOLARLY ACCOMPLISHMENTS.**

In *Riccuiti v. Gyzens*, 834 F.3d 162, 168 (2nd Cir. 2016), this Court stated: "First, speech about personal matters, as opposed to 'matters of public concern,' is not protected from retaliation.  Second, even speech on matters of public concern is not protected from retaliation unless the employee's First Amendment interests outweigh government employers' legitimate interests in efficient administration. Third, speech made by employees 'pursuant to . . . official duties' rather than 'as a private citizen' is not protected from retaliation."

In this case, the District Court did not balance the employee's First Amendment interests against the employer's legitimate interests.  The District Court did not apply strict scrutiny to the employer's interests as the Supreme Court decision in *Kennedy* advises.  Rather the District Court crafted a new rule:  when a public university is evaluating scholarship, its decisions are not subject to any balancing or scrutiny at all.  It has unbridled discretion to dress up in terms of scholarship its discrimination against a professor for his viewpoint.  That simply does not appear to represent a fair statement of the law.  While a college has the right to evaluate scholarship, that simply cannot be a pretext for violating First Amendment rights, which is amply demonstrated by the evidence in this case.  There

49

is a factual issue in dispute for the jury to decide: were defendants acting with legitimate goals of scholarship in mind or were they denying Professor Heim the opportunity for advancement because of his viewpoint. Since plaintiff has demonstrated, through defendants' own statements, that his expression of a Keynesian viewpoint was a motivating factor in defendants' decision not to consider him for promotion, defendants have the burden of proof as to whether they acted for reasons of scholarship rather than in retaliation for plaintiff's viewpoint. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977).

An example of this analysis is seen in the well-known case of *Jeffries v. Harleston*, 52 F.3d 9 (2nd Cir. 1985). Professor Jeffries was removed as Black Studies Chairman, a ministerial and non-policy-making position at the City University of New York. He gave a speech in Albany, obviously not a part of his job duties, concerning "the bias of New York State's public school curriculum and the history of black oppression" in which he "made several derogatory statements, particularly about Jews." *Id*. at 11. The CUNY Trustees then voted to limit his Chairmanship to one year instead of the customary three. This Court did not hold that his Chairmanship was too insubstantial to matter. Nor did it hold that CUNY had absolute authority to punish Professor Jeffries in light of its determination as to the poor quality of his scholarship. *See Jeffries v. Harleston*, 828 F. Supp. 1066, 1097-98 (S.D.N.Y. 1993) ("a student described theories espoused by Professor

Jeffries in class, including a theory that white people are genetically inferior 'ice' people, and black people are 'sun' people").  Rather this Court held that Professor Jeffries' speech was constitutionally protected but that CUNY was entitled to restrict his Chairmanship if CUNY realistically believed the speech, with its inclusion of arguably crackpot theories and baseless insulting comments, was reasonably likely to be disruptive to the efficient administration of the government.  "[T]he closer the employee's speech reflects on matters of public concern, the greater must be the employer's showing that the speech is likely to be disruptive before it may be punished."  52 F.3d at 13.

Professor Heim's speech was not disruptive in the slightest, as Masters admitted. [A709-710]; it greatly reflects on matters of public concern; and the likelihood of disruption to the administration of the economics department in allowing him to interview for a full-time position is non-existent.  Defendants' conviction that there is only one right way to do economics, their way, flies in the face of the history of the profession, and, quite frankly, shows supreme arrogance.

## CONCLUSION

For the foregoing reasons, the decision of the District Court should be reversed, and the matter remanded to the District Court for trial on plaintiff's First Amendment retaliation claim.

Dated:     August 1, 2022                    **COOPER ERVING & SAVAGE LLP**
           Albany, New York

51

/s/ *Phillip G. Steck*
Phillip G. Steck, Esq.
N.D.N.Y. Bar Roll No.: 102664
39 North Pearl Street
Albany, NY 12207
518-449-3900
psteck@coopererving.com

## CERTIFICATE OF COMPLIANCE WITH F.R.A.P. RULE 32(a)(7)(B)

Appellant's brief inclusive of point headings, footnotes, and quotations and exclusive of pages containing the cover, table of contents, table of authorities, certificate of conformity and addendum is 12,791.

/s/ *Phillip G. Steck*
Phillip G. Steck, Esq.