# 22-1135

## United States Court of Appeals
## for the Second Circuit

JOHN J. HEIM,

*Plaintiff-Appellant,*

v.

BETTY DANIEL, ADRIAN MASTERS, HAVIDAN RODRIGUEZ, UNIVERSITY AT ALBANY,
and THE STATE UNIVERSITY OF NEW YORK,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Northern District of New York

## BRIEF FOR DEFENDANTS-APPELLEES

BARBARA D. UNDERWOOD
  *Solicitor General*
ANDREA OSER
  *Deputy Solicitor General*
SARAH L. ROSENBLUTH
  *Assistant Solicitor General*
    *of Counsel*

LETITIA JAMES
  *Attorney General of the
  State of New York*
Attorney for Appellees
The Capitol
Albany, New York 12224
(518) 776-2025

Dated: December 1, 2022

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................iii

PRELIMINARY STATEMENT ..................................................................1

QUESTIONS PRESENTED ........................................................................4

STATEMENT OF THE CASE ....................................................................4

    A.   Background: Economic Thought Advances Throughout the 20th and 21st Centuries. .....................................................4

    B.   Plaintiff Earns His PhD in 1972 and Practices for Many Years Before Joining the University's Economics Department as an Adjunct Professor in 2012. .........................9

    C.   Plaintiff Unsuccessfully Applies for a Tenure-Track Position in the Economics Department in 2017. ...................14

    D.   Plaintiff Commences This Action. .........................................17

    E.   The District Court Grants Summary Judgment in Favor of Defendants. .......................................................................18

STANDARD OF REVIEW......................................................................22

SUMMARY OF ARGUMENT ................................................................22

ARGUMENT

   POINT I

   THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT TO DEFENDANTS ON THE MERITS OF PLAINTIFF'S RETALIATION CLAIM................................................................................................24

    A.   Plaintiff's Retaliation Claim Failed, Regardless of Whether Defendants Were Motivated by a Disagreement with Plaintiff's Speech on Keynesianism, Because Plaintiff Was Not Qualified for the Position at Issue. ...........26

1.   Plaintiff Had Not Published in Any Top Economics
     Journals. ........................................................................ 26

2.   Plaintiff Lacked a Demonstrated Ability to Train
     Students in Contemporary Research Techniques ........... 32

3.   Plaintiff's Research Agenda Reduced Opportunities
     for Collaboration with Other Faculty Members. ............ 38

B.   Alternatively, Even If Defendants Refused to Interview
     Plaintiff Based on a Disagreement with His Protected
     Speech, Their Own Interest in Academic Freedom
     Justified That Refusal. .......................................................... 41

POINT II

QUALIFIED IMMUNITY PROVIDES AN INDEPENDENT GROUND FOR
AFFIRMANCE ............................................................................... 49

CONCLUSION ..................................................................................... 51

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases**                                                               **Page(s)**

*Adams v. Trs. of the Univ. of N.C.-Wilmington*,
   640 F.3d 550 (4th Cir. 2011) ................................................................ 44

*Anemone v. Metro. Transp. Auth.*,
   629 F.3d 97 (2d Cir. 2011) ......................................................... 24, 25

*Ashcroft v. al-Kidd*,
   563 U.S. 731 (2011) ......................................................................... 50

*Bacon v. Phelps*,
   961 F.3d 533 (2d Cir. 2020) .............................................................. 49

*Bickerstaff v. Vassar College*,
   196 F.3d 435 (2d Cir. 1999) ................................................ 45, 46, 47

*Blum v. Schlegel*,
   18 F.3d 1005 (2d Cir. 1994) ................................................ 42, 43, 44

*Burt v. Gates*,
   502 F.3d 183 (2d Cir. 2007) .............................................................. 45

*Citizens United v. Fed. Election Comm'n*,
   558 U.S. 310 (2010) ......................................................................... 35

*Deem v. DiMella-Deem*,
   941 F.3d 618 (2d Cir. 2019) ............................................................. 43

*Demers v. Austin*,
   746 F.3d 402 (9th Cir. 2014) ............................................................ 47

*Dube v. State Univ. of N.Y,*,
   900 F.2d 587 (2d Cir. 1990) ................................................ 42, 44, 50

*Garcetti v. Ceballos*,
   547 U.S. 410 (2006) .................................................................. *passim*

*Hildebrand v. Bd. of Trs. of Mich. State Univ.*,
   662 F.2d 439 (6th Cir. 1981) ............................................................ 26

**Cases**                                                              **Page(s)**

*Jeffries v. Harleston,*
  52 F.3d 9 (2d Cir. 1995) ...................................................... 43

*Keyishian v. Bd. of Regents of the Univ. of the State of N.Y.,*
  385 U.S. 589 (1967) .......................................................... 42

*Kunda v. Muhlenberg Coll.,*
  621 F.2d 532 (3d Cir. 1980) ......................................... 46, 47

*Levin v. Harleston,*
  966 F.2d 85 (2d Cir. 1992) ................................................. 43

*Lieberman v. Gant,*
  630 F.2d 60 (2d Cir. 1980) ................................................. 45

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,*
  429 U.S. 274 (1977) ..................................................... 21, 24

*Naumovski v. Norris,*
  934 F.3d 200 (2d Cir. 2019) ............................................... 49

*Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will
  County, Ill.,*
  391 U.S. 563 (1968) ............................................... 19, 20, 44

*Regents of the Univ. of Mich. v. Ewing,*
  474 U.S. 214 (1985) .......................................................... 45

*Reichle v. Howards,*
  566 U.S. 658 (2012) .......................................................... 49

*Shara v. Maine-Endwell Cent. Sch. Dist.,*
  46 F.4th 77 (2d Cir. 2022) ........................................... 24, 44

*Sweezy v. New Hampshire,*
  354 U.S. 234 (1957) .......................................................... 45

*Webb v. Bd. of Trs. of Ball State Univ.,*
  167 F.3d 1146 (7th Cir. 1999) ............................................ 47

*Woolf v. Strada,*
  949 F.3d 89 (2d Cir. 2020) ................................................. 22

## United States Constitution    Page(s)

First Amendment .......................................................................... *passim*

## Federal Statutes

42 U.S.C.
  § 1983 ....................................................................................... 1

## Miscellaneous Authorities

*Annotated Listing of New Books*, 55 J. Econ. Lit. 1149 (2017).............. 32

Paul Krugman, *The State of Macro Is Sad (Wonkish)*, N.Y.
    Times Blog (Aug. 12, 2016), *available at*  https://
    archive.nytimes.com/krugman.blogs.nytimes.com/2016/08/
    12/the-state-of-macro-is-sad-wonkish/ .............................................. 34

Ray C. Fair, *Curriculum Vitae*, https://
    fairmodel.econ.yale.edu/rayfair/vitae3.pdf (last visited
    Nov. 30, 2022) ................................................................................. 16

University at Albany, *Adrian Masters*, http://albany.edu/
    economics/faculty/adrian-masters (last visited Nov. 30,
    2022)................................................................................................ 29

University at Albany, *Ben Griffy*, http://albany.edu/
    economics/faculty/ben-griffy (last visited Nov. 30, 2022).................. 17

University at Albany, *Betty C. Daniel*, https://
    www.albany.edu/~bd892/ (last visited Nov. 30, 2022)...................... 29

University at Albany, *Yue Li*, http://albany.edu/economics/
    faculty/yue-li (last visited Nov. 30, 2022).......................................... 12

## PRELIMINARY STATEMENT

In this suit under 42 U.S.C. § 1983, plaintiff John J. Heim alleges that defendants Betty Daniel and Adrian Masters, faculty members of the State University of New York at Albany (the "University"), retaliated against him in violation of the First Amendment when they declined to consider him for a tenure-track position in the economics department (the "Department"). Plaintiff argues that defendants declined to consider him because of their hostility to the school of economic thought he endorsed in his academic scholarship, known as Keynesianism, and that this constituted viewpoint discrimination prohibited by the First Amendment.

The United States District Court for the Northern District of New York (Hurd, J.) granted defendants summary judgment. The court held that plaintiff's speech on Keynesian economics was not protected by the First Amendment and, in any event, that the record established that defendants would have declined to consider plaintiff for the position regardless of any hostility to his speech, for either of two reasons: (i) he lacked any of the requisite qualifications, and (ii) defendants had legitimate reasons to fill the position with someone whose academic

scholarship they determined, in the exercise of their own academic freedom, would better address the Department's needs.

This Court should affirm. Contrary to plaintiff's framing (Br. at 14), this case is not about whether a public university must give equal consideration to "contending schools of thought" when making academic hiring decisions. While plaintiff presents himself as a heterodox thinker who was targeted for challenging prevailing economic wisdom, the record establishes that defendants declined to consider him for a tenure-track position because his publication record was inadequate, his scholarship was outdated, and he was unlikely to be able to collaborate with other members of the Department's faculty. Defendants thus declined to pursue plaintiff's candidacy without regard to viewpoint, and plaintiff failed to raise a triable issue of fact to the contrary.

Even if the record could be construed to raise an inference that defendants were motivated by hostility to plaintiff's views (and it should not be so construed), summary judgment for defendants would still have been proper. That conclusion is warranted by this Court's precedent on academic freedom—precedent that recognizes that public-university professors have a First Amendment right to engage in academic speech

2

on matters of public concern, but also that universities have their own countervailing interest in academic freedom. That interest protects the university's right to determine the content and direction of an academic program, and the related right to make academic hiring decisions based on the content of candidates' work. Plaintiff's First Amendment retaliation claim therefore fails for that reason, too. The Supreme Court's decision in *Garcetti v. Ceballos*, 547 U.S. 410 (2006), does not change the analysis. In that case, the Court held that public employees lack First Amendment protection when they speak pursuant to their official employment duties but left open the question whether the same rule applies in the specific context of academic scholarship. *Id.* at 421, 425. *Garcetti* thus left undisturbed the academic-freedom precedent that controls this case.

Finally, qualified immunity provides an alternative basis for affirmance. To the extent the Court finds that existing precedent does not compel the conclusion that the University's interest in its own academic freedom outweighed plaintiff's interest here, no clearly established law provides guidance as to how the University's interest should be balanced

against plaintiff's. And in the absence of such law, defendants reasonably could have concluded that the former trumped the latter.

## QUESTIONS PRESENTED

1.    Whether defendants were entitled to summary judgment on either of two independent grounds: (a) the record established that defendants would not have considered plaintiff for the tenure-track position at issue, regardless of any hostility to the content of his academic scholarship, because plaintiff was not qualified for the position; and (b) defendants' own interest in academic freedom provided an adequate justification for refusing to consider plaintiff's candidacy.

2.    Whether, in the alternative, defendants are entitled to qualified immunity.

## STATEMENT OF THE CASE

### A.  Background: Economic Thought Advances Throughout the 20th and 21st Centuries.

"Macroeonomics," as an academic field of study, refers to the use of statistical analysis and the development of series of equations (or "models") to test theories about the economy as a whole. (Joint Appendix ["J.A."] 530, 1141.) The following is an overview of the development of the

4

academic field of macroeconomics throughout the 20th and 21st centuries. This overview is offered to provide context for the academic dispute at issue in this appeal.

John Maynard Keynes was a British economist who published influential works in the 1930s challenging then-dominant neoclassical economic theory. Under that theory, forces of supply and demand keep economic markets in a state of natural equilibrium that produces full employment, without a need for government intervention. (J.A. 498, 1019-1020.) Keynes challenged that theory by positing that "aggregate demand" (total spending in the economy) determines the overall level of economic activity, and that inadequate aggregate demand can lead to prolonged periods of high unemployment. (J.A. 531.) While neoclassical economists posited that equilibrium would be independently restored in the long run, Keynes' famous retort was that "in the long run, we are all dead," and he thus advocated for governmental intervention (such as expansionary fiscal policy) to boost aggregate demand in the shorter term and to mitigate the adverse effects of economic recessions and depressions. (J.A. 498-499, 531.) Keynes' model of the economy was built on formulas like the "consumption function," which describes a

5

relationship between consumption and disposable income, and postulates that governmental policies that put more money in consumers' pockets will spur consumption. (J.A. 251, 822.)

Keynes' ideas took hold in the academy and in practice in the 1930s and 40s. By the 1970s, however, Keynes' influence began to wane. (J.A. 498.) In response to shifting global macroeconomic conditions, the American economist Robert Lucas posited a new theory that came to be known as the "Lucas Critique." (J.A. 814-815, 486.) Lucas argued that Keynesian analysis neglected to account for the fact that consumer behavior changes in response to governmental interventions in the market. (J.A. 500.) For example, Keynesian models were often built on the observation that consumers generally spend a flat 80% of their disposable income; thus, for example, when the George W. Bush administration issued a tax rebate to all consumers in 2008, Keynesian models predicted that consumers would spend 80% of that rebate, and thereby boost the economy by a corresponding degree. (J.A. 486.) As it turned out, however, consumers spent only 33% of the rebate and saved the lion's share. (J.A. 486.) Lucas thus showed that Keynesian models

were overly simplistic and did not accurately predict economic behavior. (J.A. 840, 1119.)

The Lucas Critique heralded a paradigm shift in economic methodology. While traditional Keynesian models were founded on fixed statistical relationships (such as the consumption function), the new methodology approached macroeconomics through the lens of individual consumer behavior. (J.A. 486.) Instead of relying on aggregate economic patterns, the new approach recognized heterogeneity in individual consumer preferences and decision-making and extrapolated macro-economic models from a range of individual consumer behaviors. (J.A. 425-426, 486, 1109, 1119.) This new approach came to be known as "micro foundations of macroeconomics." (J.A. 531.)

Models adopting this new approach were more complicated than older Keynesian models. Because the parameters of the new models accounted for variations in government policy, they would necessarily change whenever policy changed—in other words, they were dynamic. These new models did not rely on numerical constants that produced linear results, but instead were non-linear in nature. (J.A. 824-825.)

Dynamic stochastic general equilibrium modeling, or DSGE, was developed as a technique to solve these complex equations. (J.A. 825.)

Even with the advent of micro foundations and DSGE, however, Keynesianism has not become obsolete; it has simply evolved. "New Keynesians" use modern methodologies to build microeconomic foundations for Keynesian economic theories, often using DSGE modeling. (J.A. 533, 1038-1039, 1142.) Contemporary Keynesian analysis, then, often embraces DSGE techniques—it does not, as plaintiff claims, stand apart from DSGE. (*E.g.*, Br. at 7; *see* J.A. 475.) While both New Keynesianism and DSGE have received criticism (J.A. 533-535, 581-582), New Keynesian analysis—as distinct from traditional, pre-Lucas Critique Keynesian analysis—remains a fixture of the contemporary academy, including at the University (J.A. 482, 1038-1041).

Plaintiff in this case characterizes himself as a traditional Keynesian macroeconomist; he does research "as Keynes himself would have recognized it." (Br. at 12; *see also* J.A. 530, 535.) He rejects the Lucas Critique, DSGE, and New Keynesianism. (J.A. 238-239, 537-538.)

8

### B. Plaintiff Earns His PhD in 1972 and Practices for Many Years Before Joining the University's Economics Department as an Adjunct Professor in 2012.

Plaintiff received a PhD in political economy from the University in 1972. (J.A. 111, 527.) Following his doctoral studies, plaintiff worked for a number of years in various areas of state and local government before going back to school for a master's degree in public administration from Harvard. (J.A. 112-118, 527-528.) After receiving that degree in the mid-1980s, he returned to government work, where he focused on construction management and internal audits. (J.A. 118-124.)

Plaintiff began his teaching career at Rensselaer Polytechnic Institute in 1997, where he took a non-tenured, clinical position in the economics department. (J.A. 126, 528.) Plaintiff's responsibilities in that role were limited to classroom instruction and administrative duties; he taught a variety of macroeconomics courses at the undergraduate and graduate level. (J.A. 126, 528.)

Plaintiff joined the economics department at the University as an adjunct professor in or around 2012. (J.A. 494, 528.) Adjunct professors primarily teach undergraduate courses and are hired based on their practical work experience rather than academic publication record. (J.A.

9

872, 874-875, 947.) The position of adjunct professor is a contract position, not a tenure-track one; there is no possibility of promotion from the position of adjunct professor, and it is unusual for an adjunct to seek appointment to a tenure-track professorship—a position with different qualifications. (J.A. 673-674, 769-770, 872-873.)

As an adjunct professor, plaintiff taught a variety of macroeconomics and statistics courses, mostly at the undergraduate level. (J.A. 135-166.) Although plaintiff was allowed to teach Keynesian economic theory,[1] he sought to be "impartial" in his classroom instruction. (J.A. 263, 482, 492.) In his research, by contrast, he focused on Keynesian ideas, exploring concepts such as the effectiveness of Keynesian stimulus programs. (J.A. 74-75, 530.) That research has been published in books and journals. (J.A. 74-75, 530.)

---

[1] Plaintiff purported to dispute this point in his opposition to summary judgment (J.A. 518-519) but provided no evidence to suggest that any defendant ever gave him any feedback or directions regarding the topics covered in his classes. He asserted in his affidavit that defendant Daniel "denied [him] the opportunity" to continue teaching a particular class on economic modeling (J.A. 528-529) but provided no evidence to suggest that any changes in his teaching assignments were due to defendants' hostility towards his views. To the contrary, he testified at his deposition that Daniel told him that the change in teaching assignments was due to funding constraints. (J.A. 266-267.)

In 2013, the University's economics department had a job opening for a tenure-track assistant professor of macroeconomics. (J.A. 179-180, 540-541.) Plaintiff learned of the opening only after the application period had ended and emailed defendant Daniel, then the Department chair, to ask whether the Department would consider a late application from him. (J.A. 588-589.) In the email, plaintiff described the contributions he felt he could make in the area of "large scale econometric modelling of the macroeconomy," while acknowledging that his research interests diverged from the Department's focus:

> Of course, the department here at SUNY has already made a substantial investment in developing a micro foundations focus and may be more interested in adding depth to its capacity in this area. Though I have taught graduate-level micro foundations courses, it is of course, an area substantially different from my own area of interest and expertise. If this is the direction the department sees itself headed in, certainly someone far different than me would be a better match for the department and its plans than I would be.

(J.A. 588-589.)

In response, Daniel confirmed that the Department is "heavily invested in micro foundations of macro as this is the research trend in the top macro and general field journals." (J.A. 588.) She went on:

> Since we expect our faculty to publish in these journals, we do intend to continue with this direction.
>
> I did consult with Adrian and John, and we agree with you that your research differs from the course of research we want to pursue. I expect that we will hire a junior person recently trained in these techniques.
>
> I do want to encourage you to continue your research. It just does not match with the direction we are taking macro research in the Department.

(J.A. 588.) Plaintiff wrote back, "Thanks, Betty. I was pretty sure that was the case. Just checking. John." (J.A. 588.) Plaintiff did not subsequently apply for the position, which was ultimately filled by Yue Li. (J.A. 180, 764-765.) When she joined the faculty, Li had recently earned a PhD and had a research focus on "heterogenous agent modeling," which adopts a "micro foundations of macro" framework.[2] (J.A. 479, 665, 667.) Plaintiff did not apply for other tenure-track jobs at that time.

In 2016, the University hired Lewis Segal as a lecturer in the economics department (a non-tenure-track position), specifically to teach

---

[2] When the University offered Li the job, she had not yet completed her PhD degree (J.A. 665), though she had done so by the time she joined the faculty in January 2015, *see* University at Albany, *Yue Li*, http://albany.edu/economics/faculty/yue-li (last visited Nov. 30, 2022) (click "CV" link).

undergraduate-level finance courses. (J.A. 480. 489-490, 875.) He was hired in large part due to his practical experience in finance, having worked at Goldman Sachs for 11 years. (J.A. 490, 875.) He had also taught at the University as an adjunct professor for three years and was well liked by students. (J.A. 490, 875.) Because his experience made him a "perfect candidate" to fulfill the Department's teaching needs (J.A. 480), a search waiver was obtained in accordance with the University's policy so that he could be hired without a public job posting. (J.A. 616, 619-620, 738). Thus, the position was not advertised, and plaintiff did not apply for it. (J.A. 308.)

In 2017, the academic publisher Palgrave Macmillan published two books authored by plaintiff on the topic of macroeconomics. (J.A. 529.) The first book explored the effectiveness of Keynesian stimulus programs; the second offered a macro-level model of the American economy, built on a series of equations representing factors such as interest rates and inflation. (J.A. 264-265.) Both books were peer-reviewed before publication. (*See* J.A. 558.) A review of plaintiff's second book noted that "the modelling approach used by the author is one that some/many would consider outdated since the field has moved to using

DSGE or VAR models," though also opined that plaintiff had effectively demonstrated the accuracy of his approach. (J.A. 560.) Another review of the book praised its insight while also noting that it "doesn't necessarily align with the most recent methods" and "wouldn't mesh well with the current mainstream school of thought."[3] (J.A. 564.) Plaintiff's books were annotated in the Journal of Economic Literature. (J.A. 529.)

## C.   Plaintiff Unsuccessfully Applies for a Tenure-Track Position in the Economics Department in 2017.

The economics department had another job opening for a tenure-track position in 2017. (J.A. 513.) Plaintiff learned of the opening by happenstance over lunch one day, as he had not been actively searching for tenure-track positions. (J.A. 541; *see also* J.A. 187.) He was motivated to apply for the position "because of the money." (J.A. 182.) He submitted an application in October 2017 and "assumed [he] would at least be asked to interview for the position" because he believed himself to be "so much more highly qualified for a position of this type than the typical applicant." (J.A. 542.) One of plaintiff's recommenders was Professor

---

[3] Peer reviews of plaintiff's first 2017 book are not in the record.

14

Kajal Lahiri; Lahiri agreed to write a letter on plaintiff's behalf but suggested that plaintiff may not be a good fit for the position, writing, "See where it gets in the department. They may need someone who can teach macroeconomics at the PhD level."[4] (J.A. 612.)

A dispute ensued over whether plaintiff had submitted the requisite letters of reference with his application. In December 2017, plaintiff emailed defendant Masters, by then the new Department chair, purporting to attach his reference letters and urging the Department to consider the material. (J.A. 600.) After repeated emails, Masters offered his "final word on this matter," explaining that the recruitment committee (made up of Masters, Daniel, and Li) would not be inviting plaintiff to interview for the position, regardless of the status of his reference letters, because plaintiff lacked the requisite qualifications: an ability to teach and train students in contemporary research techniques, a publication record suggesting a strong likelihood of receiving tenure, and a research agenda that would permit collaboration with the

---

[4] Lahiri testified at his deposition that he "typically say[s] yes" to requests for letters of reference "because really I don't take it very seriously." (J.A. 950.)

Department's other faculty members. (J.A. 597-598.) Specifically, he

explained that the Department was looking for someone who:

> 1. Can teach and train students to conduct research in the modern (i.e., post Lucas Critique) macroeconomics that by your own admission everyone else but you and Ray Fair do.[5] Nothing in your credentials supports that possibility.
>
> 2. Has a reasonable expectation of making tenure within the department within the 6-year tenure track window. Here again the fact that you have a record speaks for itself. Nothing a letter writer can do can change that. The journals in which you have published do not achieve the standard that we expect for tenure. (Typically 4 articles in journals at the level of top field e.g., Journal of Monetary Economics or the International Economic Review.
>
> 3. Has sufficient synergies with our research agendas that we can learn from them and them from us with the possibility of constructive collaboration. Your work is not consistent with that expectation. Indeed, we rejected a number of applications that met the first 2 criteria above, but they do New Keynesian macro that we do not appreciate.

(J.A. 597-598.)

---

[5] Ray Fair is an economist who has been on faculty at Yale since 1974. *See* Ray C. Fair, *Curriculum Vitae*, https://fairmodel.econ.yale.edu/rayfair/ vitae3.pdf (last visited Nov. 30, 2022). Fair is associated with "Cowles structuralists," whose work generally predated the Lucas Critique. (J.A. 564, 613.) Plaintiff wrote in an email that once Fair retired, plaintiff would be "the main person left" in the field doing Cowles-type work. (J.A. 613.)

The Department received over 200 applications for the position and ultimately hired Ben Griffy, a recent PhD with a research focus on unemployment and inequality in labor markets—a focus that overlapped with Masters' research.[6] (J.A. 383-385, 516, 717-718, 1141.)

Plaintiff thereafter continued to teach a full course load in his role as adjunct professor until 2021. (J.A. 528-529.)

### D.  Plaintiff Commences This Action.

Plaintiff filed this lawsuit in July 2018. (J.A. 3.) He alleged in the operative complaint that he had engaged in speech on a matter of public concern—namely, academic scholarship on Keynesian economics—and that defendants Daniel and Masters violated his rights under the First Amendment by refusing to interview him for a tenure-track position on the basis of that speech. (J.A. 65.) Plaintiff also asserted a claim of age discrimination against Daniel, Masters, the University, and the SUNY system under state law, and "reserved" a claim of age discrimination under federal law. (J.A. 66-67.) For relief, he sought both money damages

---

[6] Griffy had not yet completed his PhD degree when he applied for the position (J.A. 716), though he had done so by the time he joined the faculty in August 2018, *see* University at Albany, *Ben Griffy*, http://albany.edu/ economics/faculty/ben-griffy (last visited Nov. 30, 2022) (click "CV" link).

17

against Daniel and Masters and injunctive relief against defendant Havidan Rodriguez (the president of the University) to require Rodriguez to "prevent ongoing discrimination against Keynesian economists in the economics department in the University at Albany." (J.A. 65-66.)

The district court dismissed plaintiff's claims against Rodriguez, the University, and the SUNY system on defendants' Rule 12 motion, and plaintiff later abandoned his federal age-discrimination claim. (J.A. 5 [docket no. 17]; J.A. 15.) He does not raise any arguments with respect to these claims on appeal, and we do not address them here. Thus, only plaintiff's First Amendment claim against Daniel and Masters remains at issue.

### E. The District Court Grants Summary Judgment in Favor of Defendants.

After discovery, the district court granted summary judgment in favor of defendants on plaintiff's' remaining First Amendment claim.

In their summary-judgment papers, the parties disagreed over the applicable analysis for that claim. Defendants argued that, under the Supreme Court's decision in *Garcetti v. Ceballos*, 547 U.S. 410 (2006), plaintiff's speech was not protected by the First Amendment. (ECF No.

18

68-2 at 6.)[7] *Garcetti* held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline" or adverse employment decisions. *Id.* at 421. Defendants argued that plaintiff's scholarship supporting Keynesian ideas was undertaken pursuant to his official duties and thus could not form the basis of a retaliation claim. (ECF No. 68-2 at 6.)

Plaintiff, on the other hand, urged the court not to apply *Garcetti*, because the Supreme Court in that case had expressly left open the question whether its "official duties" test would apply to speech involving academic scholarship or teaching—a carve-out that has come to be known as *Garcetti*'s "academic reservation." (ECF No. 73 at 14 [citing *Garcetti*, 547 U.S. at 425].) Plaintiff argued that his claim should instead be analyzed under the balancing test set forth in *Pickering v. Board of Education of Township High School District 205, Will County, Illinois*, 391 U.S. 563 (1968). (ECF No. 73 at 18.) That test balances (i) the

---

[7] All page references are to page numbers in the file-stamped header.

19

interests of public employees as citizens in commenting on matters of public concern against (ii) the interests of the government as employer in promoting the efficiency of public services it performs through its employees. *Pickering*, 391 U.S. at 568. Plaintiff argued that his Keynesian scholarship implicated a matter of public concern and that his interest in speaking in this area outweighed any interest of the State. (ECF No. 73 at 19-22.)

The district court held that plaintiff's speech was not protected by the First Amendment, regardless of which analysis applied. (J.A. 40-42, 44-46.) The court reasoned that plaintiff's speech was not protected under *Garcetti*'s analysis because "[a]cademic writing and research on matters related to a field of study in which the teacher is employed fall well within the 'official duties' of a public university professor."[8] (J.A. 41.) And the court reasoned that plaintiff's speech was not protected under *Pickering*'s analysis, either, because plaintiff's speech—"complex statistical modeling intended for consumption by a relatively narrow audience"—did not address a matter of public concern (J.A. 46) and that, in any event,

_____

[8] The court did not address the application of *Garcetti*'s academic reservation to this case.

20

plaintiffs' free-speech interests were outweighed by defendants' "countervailing interests," which "necessarily include the freedom to make subjective value judgments about what kind of economic theory should be taught to public university students" (J.A. 53).

The court further held that plaintiff's claim failed as a matter of law because, even assuming that plaintiff scholarship constituted protected speech, the summary-judgment record established that "the same employment action would have been taken absent the protected conduct." (J.A. 50 [internal quotation marks omitted] [citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 285-86 (1977)].) Defendants' refusal to interview plaintiff, the court found, was motivated by "legitimate pedagogical concerns," namely, the desire to hire a faculty member whose publication record indicated a strong likelihood of receiving tenure; who was able to train students in contemporary research techniques; and whose research agenda would permit collaboration with the Department's other faculty members. (J.A. 50-52.) Plaintiff lacked these qualifications. (*See* J.A. 52.)

Because plaintiff's First Amendment claim failed on the merits, the court found it "unnecessary" to address the defense of qualified immunity

raised in defendants' reply brief. (J.A. 53; *see* ECF No. 77 at 12-13.) The court nonetheless noted that "given the substantial uncertainty in this area of First Amendment law the doctrine almost certainly applies to defendants' conduct in this case." (J.A. 53.)

This appeal followed. (J.A. 83.)

## STANDARD OF REVIEW

This Court reviews a district court's order granting summary judgment de novo. *Woolf v. Strada*, 949 F.3d 89, 92-93 (2d Cir. 2020).

## SUMMARY OF ARGUMENT

The district court properly granted defendants summary judgment on the merits of plaintiff's First Amendment retaliation claim. That claim failed, regardless of whether defendants' decision not to interview plaintiff for the tenure-track position was motivated by a disagreement with his views on Keynesianism, for either of two reasons. First, plaintiff did not satisfy any—let alone all—of the viewpoint-neutral qualifications for the position: his publication record did not meet the Department's standards, making it unlikely that he would obtain tenure; he lacked a demonstrated ability to train students in contemporary research techniques; and the idiosyncratic nature of his research agenda did not

22

give rise to a potential for collaboration with other faculty members in the Department. Second, even if defendants were motivated by a disagreement with plaintiff's Keynesian views—and further assuming that plaintiff's Keynesian scholarship constituted speech on a matter of public concern protected by the First Amendment (under this Court's precedent, it likely did)—defendants' refusal to interview plaintiff had an adequate justification. Defendants, as representatives of the University, had their own countervailing right of academic freedom to determine the academic focus of the economics department.

Alternatively, qualified immunity provides an independent ground for affirmance. In the absence of any clearly established law prescribing whether and to what extent a professor's interest in academic freedom outweighs that of a university, defendants reasonably could have concluded that the university's interest controlled.

## ARGUMENT

## POINT I

### THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT TO DEFENDANTS ON THE MERITS OF PLAINTIFF'S RETALIATION CLAIM

"To make out a prima facie case of First Amendment retaliation, a plaintiff must establish (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Shara v. Maine-Endwell Cent. Sch. Dist.*, 46 F.4th 77, 82 (2d Cir. 2022) (internal quotation marks omitted).

Even if a plaintiff makes out a prima facie case of retaliation, however, "a government defendant may still receive summary judgment if it establishes its entitlement to a relevant defense." *Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 114 (2d Cir. 2011). "One such defense, articulated in *Mt. Healthy,* 429 U.S. at 287, provides that even if there is evidence that the adverse employment action was motivated in part by protected speech, the government can avoid liability if it can show that it would have taken the same adverse action in the absence of the protected speech." *Id.* (internal quotation marks omitted). "The government can also avoid liability under what is commonly referred to as

24

the *Pickering* balancing test," which balances the employee's interest in speaking against the interests of the State. *Id.* at 115.

Defendants established their entitlement to both defenses here, making it unnecessary for this Court to decide whether defendants would also prevail if the more employer-friendly analysis of *Garcetti* were extended to the realm of academic speech.[9] First, defendants would have declined to interview plaintiff even in the absence of any hostility to his allegedly protected speech because he was not qualified for the position. Second, even assuming both that plaintiff's speech about Keynesian ideas was a matter of public concern protected by the First Amendment (which, under this Court's precedent, it likely was), and that there was a causal connection between that speech and defendants' decision not to interview him, defendants' own First Amendment interests in academic freedom outweighed plaintiff's.

---

[9] As explained in in Point I.B, *infra,* the Court should not reach that question. *Garcetti* did not overrule this Court's prior precedent holding that public employees' speech on matters of public concern relating to academic scholarship or classroom instruction and undertaken pursuant to official duties is protected by the First Amendment. That prior precedent thus remains controlling law in this Court.

### A. Plaintiff's Retaliation Claim Failed, Regardless of Whether Defendants Were Motivated by a Disagreement with Plaintiff's Speech on Keynesianism, Because Plaintiff Was Not Qualified for the Position at Issue.

The undisputed evidence in the record establishes that plaintiff was not qualified for the tenure-track faculty position at issue and that defendants would have refused to interview him, regardless of any hostility to his Keynesian viewpoints, because he lacked *any* of the three qualifications for the position. *Cf., e.g.*, *Hildebrand v. Bd. of Trs. of Mich. State Univ.*, 662 F.2d 439, 444 (6th Cir. 1981) (upholding verdict against plaintiff who allegedly was denied tenure due to his protected speech where defendants established that plaintiff would not have received tenure regardless of speech).

### 1. Plaintiff Had Not Published in Any Top Economics Journals.

At the time that he applied for the tenure-track position, plaintiff had 45 years of work experience as an economist but still had not published his work in any top economic journals. The record establishes that plaintiff's failure in this regard was independently disqualifying, and the Court should affirm the grant of summary judgment on this basis alone.

In the field of economics, as in many scholarly disciplines, academic journals are the primary forum for the dissemination of ideas. Scholars in the field publish their research in journals to "push the field of science forward in a way that people notice and build upon." (J.A. 699; *see also* J.A. 415.) Economics journals are unofficially ranked according to various criteria; in tenure-track hiring, the potential to publish in top-tier journals is "paramount" and "necessary for tenure." (J.A. 476, 488.) Publication in top journals is viewed as a proxy for a candidate's ability to produce high-quality research, which is important because economics departments are ranked based on the quality of their research output. (J.A. 477.) Thus, a track record of publication in top journals—or, for candidates just finishing their schooling, a clear potential for publishing in top journals—is the "main thing" the Department looks for when hiring for tenure-track positions.[10] (J.A. 683-684.)

---

[10] Plaintiff complains that defendants' view of top journals is a "self-selected" and "subjective" one that deviates from the "objective" list recognized by the American Economics Association. (Br. at 21-22, 47.) Yet the top journals cited by defendants are all on the list favored by plaintiff, too. (*Compare* J.A. 474, 496, 646 [list of top five journals cited by defendants], *with* J.A. 548 [list of top journals cited by plaintiff].) In any event, plaintiff does not claim to have published in *any* top journal, whether on his or defendants' preferred list. And he provides no evidentiary support for his claim that the identified journals

(*continued on the next page*)

27

Plaintiff lacked such a track record—a deficiency that was fatal to his candidacy. (J.A. 457, 481, 491.) Plaintiff does not dispute that he did not publish in top journals. Indeed, he freely states that his work is "not suitable" for publication in the form of journal articles. (Br. at 22; *see also* J.A. 505.) Instead, he maintains that he was qualified for the position based on his own preferred metric, namely, his record of publishing books. (*E.g.*, Br. at 5.)

While a lay person might view the publication of a book as an accomplishment that is at least as impressive as the publication of a journal article, academics do not always see it that way. Indeed, in the Department's professional academic judgment, journal articles drive academic discourse forward, while books are "filler," written either for the author's own "edification" or "to make money." (J.A. 699.) As Masters colorfully testified, "if you want your ideas to go somewhere to die you publish them in a book," where "[t]hey are not going to be noticed or read"; if, however, ideas are published in a reputable journal, "they will be noticed, they will be read, and they will be built upon, and that's how

---

are all "DSGE-dominated" (Br. at 5; *see also* Br. at 21, 26)—a claim that is contradicted by the record in any event (J.A. 632).

28

the science moves forward." (J.A. 700.) As Daniel explained, "books are not the gold standard" in economics, because the refereeing process for books tends to be less rigorous than it is for publications in major journals. (J.A. 805.) And Edelgard Wulfert, the former dean of the University's College of Arts and Sciences—who did not know plaintiff personally and was unfamiliar with his Keynesian viewpoint—testified that "books are different" and count for less in her field of psychology, too. (J.A. 897, 903, 918, 920.)

Plaintiff identifies no evidence that the Department's stated preference for journal publications over books has been applied unevenly, or that anyone within the Department (or University) believes that book publications are a relevant data point when considering candidates for tenure-track positions. While plaintiff argues that "[b]oth Masters and Daniel obtained tenure without any significant record of publication in [top] journals" (Br. at 47), his argument mischaracterizes both defendants' CVs (*see* J.A. 474, 485).[11] Regardless, the record contains no

---

[11] *See also* University at Albany, *Adrian Masters*, http://albany.edu/economics/faculty/adrian-masters (last visited Nov. 30, 2022) (click "CV" link); University at Albany, *Betty C. Daniel*, https:// www.albany.edu/~bd892/ (last visited Nov. 30, 2022) (click "CV" link).

evidence as to the tenure-track hiring standard in place when defendants were hired—Masters in 2003 and Daniel in 1983—and that standard is not germane to tenure-track hiring today, in any case. Plaintiff also argues that neither Li nor Griffy (the successful applicants in 2013 and 2017) had published in top journals when they applied (Br. at 47), but, as the record makes clear, that is because both were hired while they were still PhD students based on their potential for publishing in top journals—a potential that they have since fulfilled (J.A. 479-480, 492, 768, 870).

Plaintiff's argument otherwise boils down to the claim that the Department should have applied his preferred criterion when reviewing his application. Plaintiff relies heavily on the fact that "the top economists in the history of the world have typically published their work in books." (Br. at 5; *see also* Br. at 22.) As Daniel and Masters explained, however, books by major economists tend to provide summaries of their life's work and are written later in their careers after obtaining tenure—not while they are still building their tenure files. (J.A. 768, 807-808.) In any event, the fact that Keynes himself and other Nobel laureates such as Milton Friedman and Joseph Stiglitz published books does not raise a

30

question of fact as to whether defendants' refusal to credit plaintiff's book publications was pretextual, as plaintiff does not suggest that any of those luminaries in the field are similarly situated to him—nor could he. With regard to a group that *is* more closely situated to him, however, plaintiff admits that "no member of the [University's] macroeconomics faculty has published any books since the department's creation in the 1960s." (Br. at 21.) That admission only corroborates defendants' testimony that, in their field, publishing books is atypical and not worthy of tenure. The record thus establishes that plaintiff's failure to publish in top journals fatally undermined his candidacy, regardless of his book publications.

Plaintiff's books were not, in any event, the significant accomplishments that he makes them out to be. Plaintiff states (Br. at 47) that they were considered as such by Professor Kajal Lahiri, a well-known econometrician at the University, but he provides no evidence to support that claim. He appears to rely on the peer review of one of his books that Lahiri completed for the publisher. But that review, which Lahiri agreed to do "as a friend" (J.A. 943), simply opined that the book was of sufficient quality for publication (*see* J.A. 558-560), not that it was

a "significant achievement in economics" (Br. at 47). Plaintiff also repeatedly cites the annotation of his books in the Journal of Economic Literature as evidence of those works' positive reception in the field. (Br. at 16, 22, 47.) However, according to the journal itself, its policy is "to annotate all English-language books on economics and related subjects that are sent to us." *See Annotated Listing of New Books*, 55 J. Econ. Lit. 1149 (2017). Thus, as Masters explained, annotation of a new book in that journal is "automatic and represents no measure of quality at all." (J.A. 1146; *see also* J.A. 692.)

## 2. Plaintiff Lacked a Demonstrated Ability to Train Students in Contemporary Research Techniques.

Not only did plaintiff lack a record of publication in top economics journals, but he also lacked a demonstrated ability to train students in contemporary research techniques. This prerequisite was viewpoint neutral. To the extent that defendants bore any "hostility" to plaintiff, as he claims (*e.g.*, Br. at 44), they were hostile only to his outdated research methodologies, not his underlying viewpoint.

That plaintiff's methodologies were outdated was confirmed by multiple witnesses, and even by plaintiff himself. As Daniel explained,

plaintiff's work relied on "techniques that were discredited by the Lucas critique in the 1970's"—perhaps understandable given that plaintiff obtained his PhD before the Lucas Critique was first published in 1976. (J.A. 481.) Plaintiff, however, was resistant to Daniel's feedback about "what he needed to do with his research to make it more modern and acceptable to modern macroeconomists," such as how to incorporate the Lucas Critique into his work. (J.A. 830; *see also* J.A. 813.) Plaintiff's refusal to update his methods was striking, given that modern macroeconomic analysis is built on post-Lucas Critique techniques. As Daniel testified, "[i]f we're going to make the department a better place, we have to hire people who do modern economics." (J.A. 835-836.)

Similarly, Griffy testified that he is unaware of any contemporary economists who do not accept the Lucas Critique, and work that does not account for its key points "hasn't been published in serious journals since the seventies." (J.A. 410, 427.) According to Masters, plaintiff's refusal to recognize the Lucas Critique constituted not just a disagreement between plaintiff and the Department, but "a disagreement between him and the rest of the profession," one that put him out of touch with "the real world when it comes to economics." (J.A. 763-764.)

Plaintiff does not dispute that he rejects the Lucas Critique; in fact, he celebrates his rejection of it. He freely admits that his work is "old-fashioned" analysis, "as Keynes himself would have recognized it." (Br. at 11-12; *see also* J.A. 537-538 [noting rejection of Lucas Critique].) But he does not attempt to show that work of this nature has any purchase in contemporary academia. He instead stitches together various criticisms of DSGE models (mostly from the popular press) (Br. at 10-14), but those criticisms show, at most, that there is always more progress to be made— not that all progress made since Keynes' day should be discarded, or that plaintiff's idiosyncratic methods have any vitality in the academy today.[12] (*See* J.A. 1144-1145.) Plaintiff also holds up his book reviews as evidence that his peculiar brand of research has made important contributions to the field (Br. at 17), but even those reviews note the

---

[12] Plaintiff makes much of Paul Krugman's endorsement, in a New York Times blog post, of "good old-fashioned Hicksian IS-LM type analysis" as a predictor of the 2008 financial crisis; plaintiff declares that he does "the Hicksian IS-LM work that Krugman was referring to." (Br. at 12.) *See* Paul Krugman, *The State of Macro Is Sad (Wonkish)*, N.Y. Times Blog (Aug. 12, 2016), *available at* https://archive.nytimes.com/krugman.blogs.nytimes.com/2016/08/12/the-state-of-macro-is-sad-wonkish/. Even assuming that Krugman was right, however, Krugman's broader point was that older Hicksian analysis (a version of traditional Keynesian analysis) stands apart from the new "paradigm that has taken over the field"—a paradigm with which plaintiff lacks a demonstrated fluency. *Id.*

34

outmoded nature of his methodology; one observed that "the modelling approach used by the author is one that some/many would consider outdated since the field has moved to using DSGE or VAR models," and another commented that the book "doesn't necessarily align with the most recent methods" and "wouldn't mesh well with the current mainstream school of thought." (J.A. 560, 564.) While the reviews commended other aspects of the book, the remarks about the dated nature of plaintiff's methods confirm that defendants' judgment in this regard was objectively valid and widely shared.

That plaintiff's work was anachronistic is relevant not only because that work was unlikely to be published in top journals, but also because it left him unable to demonstrate the requisite ability to train students in the modern techniques that his scholarship eschewed. To be clear, defendants agree with plaintiff's belief that students should be "exposed to all major theories of economics," including Keynesianism (J.A. 543); indeed, Keynesian economic thought *is* taught at the University[13] (J.A.

---

[13] Contrary to plaintiff's argument, then, defendants have not deprived students of the "right to hear Keynesian economic analysis," even assuming any such right existed. (Br. at 47.) And if such a right does exist, it certainly does not derive from *Citizens United v. Federal Election Commission*, 558 U.S.

(*continued on the next page*)

482). Defendants simply prioritized hiring a faculty member who was capable of instructing students—especially post-graduate students—in techniques common to present-day economic analysis.

As Masters explained, the Department "has a duty to teach up-to-date, relevant modeling approaches employed in the field" and "Ph.D. students, who practice in the field, must be provided the education and training to carry out quality research in the field of economics." (J.A. 1143.) The Department "would not be protecting the integrity and quality of education and research in the field if it employed a tenure-track professor whose research was clearly outdated." (J.A. 1143.) Masters "did not believe that Plaintiff could effectively instruct students at an advanced level when he practiced such outdated techniques" (J.A. 1144) and is aware of "no reputable department of economics" that trains PhD students in plaintiff's preferred methods. (J.A. 1141; *see also* J.A. 857). While plaintiff argues that he had in fact taught modern DSGE techniques "for years" at Rensselaer Polytechnic Institute, that self-serving statement, without more, is not sufficient to warrant a trial on

---

310 (2010), as plaintiff argues (Br. at 47), a case that concerned the First Amendment rights of corporations to spend money on elections.

the question whether defendants genuinely believed that he lacked the ability to train students in contemporary research methods. (Br. at 19; *see* J.A. 543.)

The foregoing establishes that defendants had a viewpoint-neutral justification for not inviting plaintiff to interview—his research methods were stale, and he was accordingly unable to train students in contemporary techniques. To the extent that any evidence in the record permits the inference that defendants were hostile not just to plaintiff's methods but also to his views, defendants, as public-university professors themselves, were permitted to shape the research focus of their department, as discussed in more detail in Point I.B below.[14]

---

[14] Contrary to plaintiff's assertion, however (Br. at 20, 46), evidence that Lewis Segal was hired as a lecturer without a competitive hiring process does not permit any inference of "discrimination" against Keynesians. Plaintiff suggests, without citation, that Segal was treated favorably because he was a "non-Keynesian" (Br. at 46), but the record contains no evidence one way or another as to Segal's views on Keynesianism. In any event, Segal is not an appropriate comparator because he was hired for a non-tenure-track position that was not subject to the same hiring rules that govern tenure-track positions. (J.A. 904-905.)

37

### 3. Plaintiff's Research Agenda Was Not Conducive to Collaboration with Other Faculty Members.

Finally, plaintiff was unqualified for the position at issue for the independent reason that his research agenda did not lend itself to collaboration with other faculty members in the Department. Again, plaintiff readily admits as much.

As early as 2013, plaintiff acknowledged that his research focus was out of step with that of the Department at large, and therefore that he was a poor fit for a tenure-track position. In reaching out to Daniel to inquire about the 2013 position, he explained that his work largely consisted of "[l]arge scale econometric modeling"; while he predicted that his approach would be "the direction for the field to go in the future," he recognized that it was not the present-day emphasis of the Department, stating:

> Of course, the department here at SUNY has already made a substantial investment in developing a micro foundations focus, and may be more interested in adding depth to its capacity in this area. Though I have taught graduate-level micro foundations courses, it is of course, an area substantially different from my own area of interest and expertise. If this is the direction the department sees itself headed in, certainly someone far different than me would be a better match for the department and its plans than I would be.

38

(J.A. 589.) Plaintiff has thus long appreciated that his research does not align with the predominant focus of the Department, and he even affirmed the Department's prerogative to hire someone with more potential to contribute to a body of work in the area of micro foundations.

Indeed, the potential to collaborate with other faculty members is a key qualification for candidates for tenure-track positions. As Daniel explained, "[r]esearch synergy among faculty staff is important because we are a small Department and tend to be more productive when we work together." (J.A. 477.) Economics papers often have multiple co-authors, and when faculty members have overlapping areas of interests and expertise, there are more opportunities to produce high-quality work together; PhD students can also be mentored more effectively. (J.A. 477; *see also* J.A. 852.) Plaintiff admits that "he did not have sufficient synergies with the research agendas of the other macroeconomics staff." (J.A. 544.)

Being able to collaborate with other faculty members is also a matter of temperament, and plaintiff did not acquit himself well in this area, either. As Masters explained, the concept of "research synergy" encompasses "an ability to engage with the other macroeconomics

professors to discuss topics of interest in a constructive manner regardless of their individual research agendas." (J.A. 491.) However, based on conversations with plaintiff during his time as an adjunct professor, Masters found that he was "not capable of such constructive conversations. More specifically, he only proselytizes on his own antiquated methodology." (J.A. 491.) Plaintiff "is not somebody that is prepared to engage about economics and talk in a thoughtful way at all. All he wants to do is promote his own ideas of how to do macroeconomics." (J.A. 708.) Daniel similarly testified that when she attempted to provide plaintiff with constructive criticism about his work, "[h]e didn't want to listen" and instead "just started lecturing [her] about how what he had done was wonderful." (J.A. 830.)

Rather than address defendants' legitimate critique of his ability to collaborate with other faculty members, plaintiff simply argues that renowned economists like Olivier Blanchard and Joseph Stiglitz "disagree with Masters that Keynesians cannot integrate into a DSGE department." (Br. at 19; *see also* Br. at 47.) But the question is not whether a hypothetical Keynesian can "integrate" into a hypothetical "DSGE department"; it is whether plaintiff himself, with his idiosyncratic

research focus, was capable of complementing the particular research focus of the Department. He has not demonstrated that he was.

## B. Alternatively, Even If Defendants Refused to Interview Plaintiff Based on a Disagreement with His Protected Speech, Their Own Interest in Academic Freedom Justified That Refusal.

Alternatively, even assuming both that plaintiff's writings on Keynesianism constituted protected speech on a matter of public concern and also that defendants refused to interview him because of that speech, defendants' own interest in academic freedom to choose the content and direction of the Department's academic program justified their refusal.

Preliminarily, it should be noted that the district court did not purport to determine whether the test set forth in *Garcetti v. Ceballos*, 547 U.S. 410 (2006), applies to plaintiff's First Amendment retaliation claim, and this Court need not and should not do so, either. In *Garcetti*, the Supreme Court observed that the First Amendment generally protects a public employee's right to speak as a citizen on matters of public concern but held that an employee's speech undertaken pursuant to official job duties is, categorically, *not* on a matter of public concern and thus is not protected by the First Amendment. *Id.* at 417, 421.

41

However, the Court expressly declined to decide whether the "official duties" test "would apply in the same manner to a case involving speech related to scholarship or teaching." *Id.* at 425. The Court thus left undisturbed earlier cases that had recognized robust First Amendment protection for academic speech by public-university professors.

One of those cases is *Dube v. State University of New York*, 900 F.2d 587 (2d Cir. 1990). There, this Court recognized that "the First Amendment tolerates neither laws nor other means of coercion, persuasion or intimidation 'that cast a pall of orthodoxy' over the free exchange of ideas in the classroom." *Id.* at 598 (quoting *Keyishian v. Bd. of Regents of the Univ. of the State of N.Y.*, 385 U.S. 589, 603 [1967]). The Court accordingly held that a public-university professor's controversial classroom instruction on Zionism was protected speech, and that university officials who allegedly denied him tenure "in response to pressure exerted by government officials and community activists outraged by his teachings" were not entitled to summary judgment. *Id.* at 597-98. Similarly, in *Blum v. Schlegel*, 18 F.3d 1005 (2d Cir. 1994), this Court held that a law professor's writings on the legalization of marijuana constituted speech on a matter of public concern and was thus

protected by the First Amendment (although the Court concluded that there was no causal connection between the speech and the allegedly adverse employment action). *Id.* at 1011-14.[15]

*Dube* and *Blum* remain binding on this Court, as neither this Court sitting en banc nor the Supreme Court has overruled them. *See Deem v. DiMella-Deem*, 941 F.3d 618, 623 (2d Cir. 2019). Indeed, *Garcetti* expressly left open the question whether academic scholarship and teaching are protected by the First Amendment and thus did not overrule cases like *Dube* and *Blum*. And, in light of *Garcetti*'s reservation of that question, there is no "conflict, incompatibility, or inconsistency" between *Garcetti* and *Dube* or *Blum*, either.[16] *Deem*, 941 F.3d at 624. *Dube* and *Blum* thus remain good law.

Under *Dube* and *Blum*, plaintiff's academic scholarship regarding Keynesian economic modeling likely constitutes speech on a matter of

---

[15] *See also Jeffries v. Harleston*, 52 F.3d 9, 12 (2d Cir. 1995) (holding that professor's off-campus lecture expressing controversial views on Jews was protected speech); *Levin v. Harleston*, 966 F.2d 85, 89 (2d Cir. 1992) (holding that professor's book review and letters expressing controversial views on race were protected speech).

[16] Further, every Circuit that has considered the issue since *Garcetti* has declined to extend *Garcetti*'s holding to cases involving post-secondary academic scholarship or instruction. (*See* Amicus Br. at 8-11 [citing cases].)

public concern, *i.e.,* speech protected by the First Amendment.[17] But that does not end the analysis. Under *Pickering*, 391 U.S. at 568, plaintiff's interest in freely producing academic scholarship must be balanced against the State's interests as an employer—for the State "has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Id*. The inquiry focuses on whether the State has "an adequate justification for treating the employee differently from any other member of the general public based on the government's needs as an employer." *Shara*, 46 F.4th at 83 (internal quotation marks omitted). "This analysis permits a nuanced consideration of the range of issues that arise in the unique genre of academia." *Adams v. Trs. of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 564 (4th Cir. 2011).

---

[17] *Dube*, 900 F.2d at 598, suggests that all academic speech, at least in the post-secondary setting, is categorically a matter of public concern, while *Blum*, 18 F.3d at 1011-12, suggests that a case-by-case analysis is needed to determine whether the particular speech at issue pertains to a matter of public concern. However, the Court need not decide between these two approaches; it is enough for present purposes to assume that plaintiff's speech on Keynesianism was indeed protected as a matter of public concern.

In this context, the State's interests as an employer include the interest of the University in its own academic freedom to determine the content and structure of its academic programs and to select the faculty best suited to implement the chosen program. Academic freedom, as the Supreme Court has explained, "thrives not only on the independent and uninhibited exchange of ideas among teachers and students, but also, and somewhat inconsistently, on autonomous decision-making by the academy itself." *Regents of the Univ. of Mich. v. Ewing*, 474 U.S. 214, 226 n.12 (1985) (internal citations omitted). That decision-making authority includes a university's "right to make its own rules concerning academic standards and discharges," *Burt v. Gates*, 502 F.3d 183, 190 (2d Cir. 2007), and its "prerogative 'to determine for itself on academic grounds who may teach,'" *Lieberman v. Gant*, 630 F.2d 60, 67 (2d Cir. 1980) (quoting *Sweezy v. New Hampshire*, 354 U.S. 234, 263 [1957] [Frankfurter, J., concurring]).

Courts are generally reluctant to intrude on universities' exercise of these prerogatives, particularly when it comes to personnel decisions. For example, in *Bickerstaff v. Vassar College*, 196 F.3d 435 (2d Cir. 1999), this Court affirmed the dismissal of claims brought by a professor who

alleged that she had been denied promotion to full professor because of her race and sex. While those claims were brought under anti-discrimination statutes and did not allege any constitutional violations, the Court's analysis is nonetheless instructive: the Court declined to second-guess the college's judgment of the plaintiff's qualifications, noting that "Vassar alone has the right to set its own criteria for promotion and then to evaluate a candidate's fitness for promotion under them." *Id.* at 455. The Court further cautioned that "[c]ourts should not substitute their judgment for that of the college with respect to the qualifications of faculty members for promotion and tenure." *Id.* at 455 n.7 (alteration omitted) (quoting *Kunda v. Muhlenberg Coll.*, 621 F.2d 532, 548 [3d Cir. 1980]). As the Court explained:

> Determinations about such matters as teaching ability, research scholarship, and professional stature are subjective, and unless they can be shown to have been used as the mechanism to obscure discrimination, they must be left for evaluation by the professionals, particularly since they often involve inquiry into aspects of arcane scholarship beyond the competence of individual judges.

*Id.* (quoting *Kunda*, 621 F.2d at 548). The Court thus recognized that a university's ability to make academic hiring decisions "is an important

part of our long tradition of academic freedom." *Id.* at 457 (internal quotation marks omitted).

While "[a] university's academic freedoms are qualified by the need to respect faculty members' civil rights," a university's decision as to which faculty to hire necessarily—and permissibly—entails consideration of the content of and views expressed in applicants' work product. *Webb v. Bd. of Trs. of Ball State Univ.*, 167 F.3d 1146, 1150 (7th Cir. 1999). As the Seventh Circuit has explained, "when deciding who to appoint as a leader or teacher of a particular class, every university considers speech (that's what teaching and scholarship consists in) without violating the Constitution." *Id.* The Ninth Circuit has similarly observed that a university's "content-based judgment" of "a professor's writing for purposes of tenure or promotion" is "both necessary and appropriate." *Demers v. Austin*, 746 F.3d 402, 413 (9th Cir. 2014). And the Third Circuit has remarked that "it is beyond cavil that generally faculty employment decisions comprehend discretionary academic determinations which do entail review of the intellectual work product of the candidate." *Kunda*, 621 F.2d at 547. Thus, for example, a university likely has the discretion to hire for its environmental-sciences

47

department only those scholars whose work assumes that climate change is occurring and seeks to ameliorate it (or the opposite, if the department so chooses). And, in plaintiff's hypothetical (Br. at 2-3), if a political-science department wanted to develop a research focus on Marxist political theory (or, conversely, if it wished to develop a focus in anything *but* Marxist theory), it could properly assess a candidate's work product for a demonstrated expertise in the department's desired research area.

Here, even assuming that defendants' decision not to interview plaintiff for the tenure-track position was made on the basis of his Keynesian views and demonstrated research focus, defendants were constitutionally permitted to reject plaintiff's application on that ground. As Daniel testified, "Good departments are strong in particular areas," not "spread out and thin." (J.A. 852.) Defendants, as representatives of the University's economics department, were permitted to make judgments about the specific academic concentrations that would best position the Department to produce high-quality research and to effectively train students. And in making those judgments, defendants were permitted to evaluate the content of plaintiff's research and to

48

determine that that content would not further the Department's academic mission. Plaintiff's First Amendment claim thus fails.

## POINT II

**QUALIFIED IMMUNITY PROVIDES AN INDEPENDENT GROUND FOR AFFIRMANCE**

Finally, even if the Court were to conclude that defendants violated plaintiff's right to free speech when they decided not to interview him for the position at issue, it should affirm on the alternative basis of defendants' qualified immunity.

A state official is entitled to immunity from suits for damages whenever "(1) his conduct did not violate clearly established law, or (2) it was objectively reasonable for the official to believe that his action did not violate such law." *Naumovski v. Norris*, 934 F.3d 200, 210 (2d Cir. 2019) (internal quotation marks omitted). "To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Bacon v. Phelps*, 961 F.3d 533, 545 (2d Cir. 2020) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 [2012]). "In other words, 'existing precedent must have placed

the statutory or constitutional question beyond debate.'" *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741, [2011]).

Here, *Dube*, 900 F.2d at 596-97, clearly established that university professors have a First Amendment right to engage in classroom instruction without interference; however, neither *Dube* nor any other relevant case establishes whether or to what extent a professor's right to engage in academic scholarship of his choosing outweighs a university's own right of academic freedom to choose the content and direction of its academic program. In the absence of any such precedent, defendants reasonably could have determined that the university's right outweighs the individual's right in this context, and they are thus entitled to qualified immunity.

## CONCLUSION

This Court should affirm the judgment of the district court.

Dated:  Albany, New York
   December 1, 2022

            Respectfully submitted,

            LETITIA JAMES
             *Attorney General of the*
             *State of New York*
            Attorney for Appellees

        By:  /s/ Sarah L. Rosenbluth
            SARAH L. ROSENBLUTH
            Assistant Solicitor General

            The Capitol
BARBARA D. UNDERWOOD    Albany, New York 12224
 *Solicitor General*       (518) 776-2025
ANDREA OSER
 *Deputy Solicitor General*
SARAH L. ROSENBLUTH
 *Assistant Solicitor General*
  *of Counsel*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Sarah L. Rosenbluth, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 9,943 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7).

 /s/ Sarah L. Rosenbluth
SARAH L. ROSENBLUTH