# 22-1135

---

**United States Court of Appeals
for the
Second Circuit**

---

JOHN J. HEIM,

*Plaintiff-Appellant,*

-against-

BETTY DANIEL, ADRIAN MASTERS, HAVIDAN RODRIGUEZ,
UNIVERSITY AT ALBANY, THE STATE UNIVERSITY OF NEW YORK

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

---

## APPELLANT'S REPLY BRIEF

---

**Cooper Erving & Savage LLP**
*Attorneys for Plaintiff-Appellant*
39 North Pearl Street
Albany, New York 12207
(518) 449-3900

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................... i

TABLE OF AUTHORITIES ........................................................... ii

ARGUMENT ................................................................................. 1

I.   DEFENDANTS' SELF-CONTRADICTORY STATEMENTS DO
     NOT ESTABLISH THAT THEY DENIED PLAINTIFF THE
     OPPORTUNITY FOR A FULL-TIME POSITION BECAUSE OF HIS
     QUALIFICATIONS RATHER THAN HIS VIEWPOINT. .................... 1

II.  DEFENDANTS DO NOT HAVE ACADEMIC FREEDOM TO
     MAKE BIGOTED STATEMENTS ABOUT KEYNESIAN
     ECONOMICS. ..................................................................... 10

III. PLAINTIFF'S THEORY OF THE CASE IS WELL-ESTABLISHED,
     SO THE UNTIMELY DEFENSE OF QUALIFIED IMMUNITY DOES
     NOT APPLY. ....................................................................... 15

CONCLUSION ............................................................................ 16

CERTIFICATE OF COMPLIANCE WITH F.R.A.P. RULE 32 (a)(7)(B) .......... 18

i

# TABLE OF AUTHORITIES

## CASES

*Baker v. F & F Inv.*, 470 F.2d 778, 783 (2d Cir. 1972) ..................... 14

*Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 455 n.7 (2d Cir. 1999) ..................... 13

*Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*,
444 F.3d 158, 168 (2d Cir. 2006) ..................... 9

*Citizens United v. FEC*, 558 U.S. 310, 339 (2010) ..................... 8

*Content v. Curran*, 2022 U.S. Dist. LEXIS 179290,
at *3 (S.D.N.Y. Sep. 30, 2022) ..................... 15

*Demers v. Austin*, 746 F.3d 402, 418 (9th Cir. 2014) ..................... 11

*Garcetti v. Ceballos*, 547 U.S. 418 (2006) ..................... 16

*Jeffries v. Haleston*, 52 F.3d 9 (2nd Cir. 1985) ..................... 16

*Kunda v. Muhlenberg College*, 621 F.2d 532, 547 (3rd Cir. 1980) ..................... 12

*Reeves v. Sanderson Plumbing Products*, 530 U.S. 133, 148 (2000) ..................... 9

*Webb v. Board of Trustees of Ball State Univ.*,
167 F.3d 1146, 1150 (7th Cir. 1999) ..................... 11, 15

## OTHER

*Journal of Economic Literature* ..................... 3

*Macroeconomics* (2007) (Textbook, N. Gregory Mankiw) ..................... 7

## ARGUMENT

**I. DEFENDANTS' SELF-CONTRADICTORY STATEMENTS DO NOT ESTABLISH THAT THEY DENIED PLAINTIFF THE OPPORTUNITY FOR A FULL-TIME POSITION BECAUSE OF HIS QUALIFICATIONS RATHER THAN HIS VIEWPOINT.**

Defendants lead by repeating the argument that all Keynesian economics is passe. This is contrary to the evidence in the record, which defendants ignore. Simply because such an eminent authority as defendant Adrian Masters thinks that way does not make it so. In fact, far more influential thinkers in the world of economics disagree with him.

Plaintiff has established that there are two competing schools of economics: the Freshwater school, which defendants follow in their advocacy for DSGE methodology, and the Saltwater school, which advocates for Keynesian economics. [A-533] The deposition testimony of a variety of witnesses confirmed this division: Paul Hohenberg, past president of the Economic History Association; Inbong Kang, chief economist of the New York State Assembly; John Polimeni, Associate Professor of Economics at the Albany College of Pharmacy (a part of Union University). [A-538-540] So do the public statements of a variety of leading economists: Nobel Laureates Paul Krugman, Joseph Stiglitz, and Robert Solow; Olivier Blanchard (former Chief Economist at the International Monetary Fund); Gregory Mankiw (Professor of Economics at Harvard University and a founder of

1

DSGE); William Freund, former chief economist of the New York Stock Exchange; and Noah Smith, a younger academic economist who became more widely known as a columnist for Bloomberg News [A-533-535, 540, 545-546]. Krugman specifically stated that he and others do IS-LM equations, the exact type of work Professor Heim does; that those equations describe more accurately than DSGE the behavior of economies; and that DSGE was a purely theoretical construct that was crowding out economic analysis that actually works, thus actively doing harm to macroeconomics. [A-533-535]

Defendants contradict themselves in saying that New Keynesian economists utilize DSGE methodology but then turn around and admit that SUNY Albany does not accept the validity of even New Keynesian economics. [Defendant's brief at 16; A-533 fn. 6 (citing testimony of Masters); 536-537, 545, 551] Only DSGE orthodoxy is acceptable at this University. Defendants thus discriminate against all Keynesiansm, even those who seek to assimilate DSGE techniques into their work.

Further, defendant Adrian Masters makes a myopic, extraordinary statement that is the height of supreme arrogance. He argues that plaintiff is the only person in the world practicing his style of Keynesianism; it's a disagreement between Heim and everyone else. [Defendants' Brief, p. 33] That is contradicted in the statement of Paul Krugman that he and many others use the same IS-LM methods that

2

Professor Heim employs and that such analysis better reflects the real world than DSGE modeling. [A-533-535]

Defendants argue that plaintiff is unqualified because he publishes his work in books rather than journals. According to them, no leading economist publishes books. Masters again displays extreme arrogance in arguing that books are where ideas go to die. Defendants' Brief, p. 28. On the contrary, as pointed out in plaintiff's principal brief, this would exclude from consideration for hiring at SUNY Albany many of the greatest economists in the history of the world who published their best work in books [A-547] (Masters admitted that this university simply cannot attract many of the best minds in economics whose ambitions may be greater) [A-755]. Without belaboring the point, plaintiff again points out that the most famous recent work in economics was a book, Thomas Piketty's *Capital in the 20th Century*. [A-505]. Piketty is a Keynesian economist who taught at MIT before returning to his native France. [A-547] Like plaintiff, he is a Keynesian whose work does not lend itself to short journal articles.

Defendants contend the *Journal of Economic Literature*, a preeminent journal, lists all books on economic literature. If defendants were correct in their view of books on economics, the *Journal of Economic Literature* would have ceased pointing out books on economics long ago. Furthermore, plaintiff's work was published by MacMillan Palgrave, universally acknowledged, including by Edegard

3

Wulfert, the Dean of Arts & Sciences at SUNY Albany, as a high-quality academic publisher (though Masters and Daniels were unfamiliar with the criteria for publishing with that house). [A-496]

Defendants ignore the highly positive review of plaintiff's books by their own top economist. Dr. Kajal Lahiri, who acknowledged the high quality of MacMillan Palgrave as well [A-944], cites plaintiff for excellent scholarship and argues the book could well serve as a basis for teaching graduate students about macroeconomics. Dr. Lahiri wrote:

> Yes, this book provides a much needed alternative to the approaches used today for modelling economies. As such, this book could be a standard for many studying or conducting research in macroeconomics .... The scholarship presented is very good. . . . Yes, the author is wellqualified to produce a high quality book on this topic. He has considerable experience in macroeconomic modelling and his approach used in this book proposal has been vetted in numerous presentations at conferences and among colleagues. . . . [T]the author explains very well why those [DSGE and VAR] approaches are not better than the approach he uses. In fact, this is a strength of the paper; he outlines in great detail why a Keynesian Cowles modelling approach is more accurate in describing how the macroeconomy really works.[1]

In fact, defendants have not a single professor who qualifies as a macroeconomist according to the definition of the term in use by the Federal Reserve (macroeconomists model whole economies, not just particular markets within the

---

[1] Defendants assert that Dr. Lahiri wrote this as a friend of plaintiff. Defendants are certainly free to call Dr. Lahiri as a witness to testify he did not mean what he said in his review of the book. It would be interesting to see how that position would fare on cross-examination.

economy). [A-530] Masters analyzes only the labor market, as does Griffy who was hired because he does the same work as Masters. [A-551] Li studies health care markets only. She regards herself as micro foundations of macro. And she criticized Griffy's focus as narrow and downgraded him for weak presentation skills. Clearly Griffy was hired for his allegiance to Masters' views on economics and for no other reason. [Id.]

Nor do defendants themselves live by the same criteria they purport to apply to Professor Heim. Defendants Masters and Daniel did not publish in top journals when they obtained tenure, nor did Li or Griffy at the time they were hired, as they did not even have Ph.Ds. [A-548-551] At the time of defendants' motion for summary judgment, Griffy still had not published in any journal ranked higher than number 233. [A-549, fn. 14] Plaintiff's affidavit reports the following:

> Masters has nothing published in the journals ranked 21-40. He published once in the #13 journal, The Journal of Labor Economics, but that was not published until after he got tenure in 2005. While Daniel had three top journal articles before she got tenure, this does not mean Albany ever required such publication for tenure. She got tenure in 1986; 19 years later the same department gave tenure to Masters who had no articles in a top journal before he got tenure (and that work was not his alone; it was co-authored with another economist). Hence it does not seem likely the department ever had a policy of requiring publications in top journals before tenure would be granted. It is not clear why I would have to meet criteria that others were not required to meet. [A-548-549]

Defendants' response is that plaintiff is mischaracterizing the resumes of Masters and Daniel, but utterly fail to say in what manner their resumes are

mischaracterized, so there is nothing to rebut plaintiff's assessment of their qualifications. Defendants make the lame excuse that standards may have been different when Masters and Daniel received tenure, but again fail to specify what those standards were, thus engaging in pure speculation. Defendants' Brief, pp. 29-30.

Defendants invoke the oft-misused phrase "self-serving" to describe plaintiff's contention that the top journals recognized by defendants do not publish Keynesian work. In fact, Masters and Daniel both agreed this is true. [A-536] Paradoxically, everything Masters says is gospel but when plaintiff testifies that his experience is different, that becomes self-serving. For example, defendants argue that an accusation of "stale research" is content-neutral and cannot be discriminatory in violation of freedom of speech. Defendant's Brief, p. 37. Plaintiff, however, has demonstrated that Masters saying the research is stale does not make it so in the eyes of the economics profession taken as a whole.

Defendants attack plaintiff as rather doctrinaire. This is contrary to the testimony in the record. Masters admitted that plaintiff was not at all disruptive in his opposition to DSGE. [A-546] Disruptiveness is what the *Pickering* test requires to justify suppressing speech, not simply disagreement with defendants' orthodoxy. Even more importantly, plaintiff touted has ability to teach DSGE modeling.

> I taught DSGE economics to Ph.D. students at Rensselaer Polytechnic Institute for 8 years. I even discussed the text I used (Romer) with

Masters several times. It was in fact one of the very books Masters himself used to teach DSGE economics. Masters admitted this. [AM93][2]. Indeed, coming to DSGE from a critical perspective, would allow me to provide students with an even better understanding of the technique than doctrinaire true believers right out of graduate school who had no experience teaching it and little or no exposure to competing ideas, as we will see was the case with both Yue Li and Ben Griffy. [A-543]

Plaintiff simply believes, as many others do, that DSGE is abstract modeling and not reflective of real-world reality. It thus suffers from the same defects as neo-classical free market economics before Keynes. In any event, it doesn't matter because the bridge between Keynesianism and DSGE is New Keynesianism which defendants reject. Finally, Professor Blanchard sees opportunities for DSGE and Keynesians to work together even in the absence of the New Keynesian approach. [A-544] Thus, it is defendants who are rigid and unbending.

This is further seen in their absolute unyielding allegiance to the so-called "Lucas critique."[3] Defendants cite Griffy's contention that he does not know of anyone who does not accept the Lucas critique. Defendants Brief at p. 33-34. This

---

[2] This is a reference to the deposition testimony of Masters at pg. 93 or A-714.

[3] In defense of the Lucas critique, Defendants cite [brief p. 6] the following assertion by Masters with reference to the 2008 Bush administration tax rebate: "Keynesian models predicted that consumers would spend 80% of that rebate, and thereby boost the economy by a corresponding degree." This has nothing to do with the Lucas critique and is a misrepresentation. Keynesian empirical studies have shown before and after Lucas that one-time rebates are less effective economic stimulators than other policies, as recognized in a basic Keynesian textbook, Mankiw, *Macroeconomics* (2007), citing to Keynes (who did not predict a specific level of consumer spending in response to a rebate), pp. 300, 312, Modigliani (a leading Keynesian and a Nobel laureate), pp. 509-13, and the Monetarist Friedman, pp. 513-516. Lucas is not part of this discussion.

only proves that Griffy is an economics novice who is unfamiliar with the works of major economists in the field. For example, Keynesian IS-LM analysis pre-existed the Lucas critique and, as Krugman and others have pointed out, is not idiosyncratic; it remains in usage in Saltwater departments notwithstanding the Lucas critique.

Economics is not supposed to be a religion in which a practitioner has faith. As Krugman and others point out, DSGE has not stood up to econometric analysis and in many economics departments is "crowding out" Keynesian analysis that actually works and is accepted by policymakers all over the world. Academia is not a world unto itself, as much as Masters may wish to make it so. [A-536 (Masters describing Keynesianism as excessively data driven and not purely theoretical)]

Masters position is again self-contradictory. As pointed out in the Brief of the *Amicus Curiae*, at pp. 18-19, the SUNY Economics Department itself emphasizes that the study of economics must have a connection to the actual behavior of economies in the real world.

In their zeal to defend hiring only DSGE economists, defendants show disregard for the principles underlying the First Amendment. The principle discussed in *Citizens United v. FEC*, 558 U.S. 310, 339 (2010), that the First Amendment protects not only the right of the speaker to speak, but of the listener to hear, is a principle of jurisprudence that is applicable all across the spectrum of First Amendment issues, not simply limited to the facts of *Citizens United*. Here, limiting

plaintiff to teaching undergraduate introductory courses, like economic statistics, in which Keynesianism is not at issue, deprives graduate students at SUNY Albany of the right to hear about Keynesian economics, so they can assess independently its benefits and drawbacks, rather than simply being indoctrinated in the DSGE viewpoint, as was done with Marxism in Soviet academia. Krugman commented:

> Olivier offers some awfully weak tea: DSGE models can fulfill an important need in macroeconomics, that of offering a core structure around which to build and organize discussions. Really? That's the point of a paradigm that has taken over the field? It sounds, by the way, exactly like the defenses I heard of academic Marxism when I was young: never mind whether it's right, it provides a framework. [A-534-535]

All defendants' factual arguments are designed to support a defense that, even though their hiring committee was overtly biased against Keynesians, nonetheless they would not have hired Heim anyway because he lacked qualifications for the job. See *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 168 (2d Cir. 2006) ("Absent Plaintiff's Speech Would Defendants Have Abolished His Position?"). As in *Cioffi*, however, that defense does not arise when there are disputed issues of fact as to plaintiff's qualifications. The contentions of the defense in that regard are not simply taken at face value. Here, as in *Cioffi*, plaintiff has presented evidence to rebut defendants' claimed defense, so the matter must proceed to trial. *Id.* at 168-169. The defense has an argument, but it has not conclusively established its defense. *See Reeves v. Sanderson Plumbing Products*, 530 U.S. 133,

9

148 (2000) (defense not conclusively established, so summary judgment inappropriate).

## II. DEFENDANTS DO NOT HAVE ACADEMIC FREEDOM TO MAKE BIGOTED STATEMENTS ABOUT KEYNESIAN ECONOMICS.

Defendant Masters contended that plaintiff is unique in the entire economics profession in the Keynesian IS-LM research that he does [Defendants' Brief, p. 33], that Keynesians do not make contributions to economics anymore [A-637], and that no meaningful economics is published in books [Defendants' Brief, p. 28]. The evidence most certainly does not support those conclusions. Yue Li testified that all Keynesians want to do is print money. Ben Griffy admitted he knew nothing about Keynesian economics. [A-551, 519]

Defendants further did not identify any written policies of the University which would mandate excluding anyone from full-time employment because he or she does not publish in top DSGE journals. Defendants do not even have a concrete list of such top journals. Defendants' rationales for excluding Keynesian economists from full-time employment are either the result of sheer bigotry against Keynesians or result from *ad hoc* judgments made during the hiring process, rather than any systematic or even-quasi objective criteria for evaluating candidates. Defendants did not even think Heim's books were worthy of being read, yet acknowledged that

one of the books concerned an important topic in economics, the "crowding out effect." [A-546-547]

There is no rule of law which supports defendants' argument that their academic freedom would allow them to discriminate against Professor Heim because of his Keynesian viewpoint. The Courts have not endorsed such extremism in academia in any of the cases cited by defendants.

In *Demers v. Austin*, 746 F.3d 402, 418 (9th Cir. 2014), the Ninth Circuit held that public universities are indeed entitled to exercise judgment concerning the quality of a professor's writing when necessary and appropriate. Nonetheless, the Court concluded that the District Court erred in holding that plaintiff's papers did not address a matter of public concern, extended First Amendment protection to the professor's work, and confirmed that summary judgment was properly denied because at most an issue of fact was created as to "whether defendants would have taken such employment action absent the protected speech." *Id*. at 417. This is entirely consistent with the analysis which plaintiff-appellant has urged be applied here.

Defendants, characteristically, provide an incomplete quote from the Seventh Circuit in *Webb v. Board of Trustees of Ball State Univ*., 167 F.3d 1146, 1150 (7th Cir. 1999). Indeed, the full sentence from the court includes "[a] university's academic freedoms ***are qualified*** by the need to respect faculty members' civil

11

rights. . . ." [Emphasis added]  This is exactly the position advanced by plaintiff in this case.  The Court did not endorse an extreme application of the university's academic freedom to give defendants *carte blanche* to discriminate against Keynesian economists.  In denying preliminary injunctive relief, the Court said that it "need not attempt to determine when a court may interfere with a university's curriculum or choice of department heads; it is enough to say that the issues raised by a request for such relief are reason enough to withhold it at an early stage of a suit." *Id*.

The Third Circuit in *Kunda v. Muhlenberg College*, 621 F.2d 532, 547 (3rd Cir. 1980), did not endorse immunity for a University based on its own academic freedom to exclude a particular viewpoint.  It ruled that a balance needed to be struck between "academic freedom, the wellspring of education, ***[which] is entitled to maximum protection***" and "faculty employment decisions [that] comprehend discretionary academic determinations which do entail review of the intellectual work product of the candidate." [Emphasis added]  The court affirmed a District Court decision holding that the college's claim that the plaintiff lacked a master's degree was a pretext for discrimination, because she had satisfied sanctioned alternatives to the master's degree, and ordered her reinstated with back pay and tenure.  Despite noting that "courts must be vigilant not to intrude into [a college's] determination [with regard to an employment decision], and should not substitute

12

their judgment for that of the college with respect to the qualifications of faculty members for promotion and tenure," *id*. at 548, the Third Circuit determined that the record established that the plaintiff had achievements and qualifications such that the college's argument otherwise could be viewed as pretextual.

Defendants cite one case from this Court. In *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 455 n.7 (2d Cir. 1999), this Court indeed stated, as Defendants argue, that "[d]eterminations about such matters as teaching ability, research scholarship, and professional stature are subjective, and unless they can be shown to have been used as the mechanism to obscure discrimination, they must be left for evaluation by the professionals, particularly since they often involve inquiry into aspects of arcane scholarship beyond the competence of individual judges." This comment was made, however, in response to the plaintiff's argument that her overall CEQs (Course Evaluation Questionnaires) were equal to other past successful candidates and thus consistent with the University's "***posted criteria*** for promotion requir[ing] 'continued demonstration of . . . teaching of high quality.'" *Id.* [Emphasis added] The Africana Studies Committee found "problems" with the plaintiff's classroom teaching as reflected in her CEQs. The Education Committee likewise found plaintiff's CEQs "placed her 'considerably lower than what would be expected of a faculty member at Vassar in order to receive a marked distinction in teaching.'" *Id*. at 443. When read in context of a plaintiff who failed to meet the University's

13

requirement of "continued demonstration of . . . teaching of high quality" for promotion, the Court determined that the plaintiff failed to establish that her race or sex were the reasons she was not promoted instead of the University's determination with regard to her qualifications. Moreover, the Court in *Bickerstaff* found that the statistical analysis the plaintiff produced was "not probative because it omitted the major variables. Thus, [this analysis] falls within the Bazemore exception - that 'there may . . . be some regressions so incomplete as to be inadmissible as irrelevant.'" *Id*. at 449. Thus, the college's reliance on its own measurement of teaching performance, the CEQ's, won out over the plaintiff's effort to counter with an objective statistical measurement of her own.

In the case at bar, on the contrary, defendants are arguing that the hiring committee was essentially free to take any path it chose, including expressing unmitigated animus towards Keynesian economics. Defendants have no objective criteria. Nor have they cited a single case declaring that a public university's academic freedom may be used to squash the free speech rights of a professor teaching there.[4] Thus, in the context of a public university, like the University at

---

[4] Muhlenberg College and Vassar College are private institutions to which the First Amendment does not apply. They do not have to give free speech protection to the professors in the same way as public universities do which are bound by the First Amendment's preferred position in American jurisprudence. "While we recognize that there are cases -- few in number to be sure -- where First Amendment rights must yield, we are still mindful of the preferred position which the First Amendment occupies in the pantheon of freedoms." *Baker v. F & F Inv.*, 470 F.2d 778, 783 (2d Cir. 1972).

Albany, as the Court stated in *Webb*, *supra*, "[a] university's academic freedoms **are qualified** by the need to respect faculty members' civil rights. . . ."

### III. PLAINTIFF'S THEORY OF THE CASE IS WELL-ESTABLISHED, SO THE UNTIMELY DEFENSE OF QUALIFIED IMMUNITY DOES NOT APPLY.

Defendants admit that they did not raise the defense of qualified immunity until their reply brief in the District Court. Defendants' Brief at page 22. It is well-established that a Court need not consider arguments raised for the first time in a reply brief. "Contrary to defendants' assertion, this Court did not overlook defendants' argument that they are entitled to qualified immunity on plaintiff's excessive force claims. Rather, the Court did not reach the issue because defendants raised it for the first time in their reply brief. '[I]t is well settled in the Second Circuit that a party may not raise an argument for the first time in his reply brief[.]'" *Content v. Curran*, 2022 U.S. Dist. LEXIS 179290, at *3 (S.D.N.Y. Sep. 30, 2022).

Be that as it may, defendants' qualified immunity argument is deficient on the merits. Defendants argue that they are entitled to qualified immunity because they allege there has been no case which has adjudicated the precise factual issues in dispute here: whether it is permissible for defendants' to discriminate against plaintiff for views expressed outside the classroom or to discriminate against those views on the grounds of defendants' own academic freedom.

15

This is incorrect for several reasons. First, qualified immunity does not arise simply because the facts of one first amendment retaliation case are different from another, so long as the principle at issue has been well-established, namely that plaintiff may not be retaliated against for scholarly speech to which defendants have manifested overt hostility. Second, as far back as *Jeffries v. Haleston*, 52 F.3d 9 (2nd Cir. 1985), this Court held that a professor may not be retaliated against for speech he uttered outside the classroom. In that case, Jeffries was a professor at the City University of New York and he was being disciplined for a speech he gave in Albany which was not in any way related to his classroom duties.[5] Third, defendants here are arguing for a change in the law, that, despite expressing overt hostility to plaintiff's Keynesian viewpoint, they are free to do so because of their own academic freedom. That would eviscerate the whole line of case law cited even by defendants that guarantees First Amendment protection in the academic environment. There is no case defendants have cited that stands for the broad rule they propose, which was not in existence at the time defendants acted, so they cannot claim qualified immunity in reliance on such a rule.

---

[5] Defendants do not appear in their brief to enthusiastically press the argument they made in the District Court that the rule of *Garcetti v. Ceballos*, 547 U.S. 418 (2006), should govern this case. Therefore, plaintiff relies on the position it expressed in its principal brief and in the brief of the *Amicus Curiae* on this issue.

## CONCLUSION

For the foregoing reasons, the decision of the District Court should be reversed, and the matter remanded to the District Court for trial on plaintiff's First Amendment retaliation claim.

Dated:    December 16, 2022      **COOPER ERVING & SAVAGE LLP**
          Albany, New York

                           /s/ Phillip G. Steck
                           Phillip G. Steck, Esq.
                           N.D.N.Y. Bar Roll No.: 102664
                           39 North Pearl Street
                           Albany, NY 12207
                           518-449-3900
                           psteck@coopererving.com

## CERTIFICATE OF COMPLIANCE WITH F.R.A.P. RULE 32(a)(7)(B)

Appellant's brief inclusive of point headings, footnotes, and quotations and exclusive of pages containing the cover, table of contents, table of authorities, certificate of conformity and addendum is 4,345.

/s/ Phillip G. Steck
Phillip G. Steck, Esq.